EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS SANDALIO MUNERA, acusado y apelante.

No. 3366. *Sometido:* Abril 17, 1928.—*Resuelto:* Marzo 12, 1929.

296

*Felipe Colón Díaz,* abogado del apelante; *José E. Figueras,* abogado de *El Pueblo,* apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Luis Sandalio Munera fué condenado a seis años de presidio como autor de un delito de violación. No conforme

con la sentencia, apeló, señalando en su alegato la comisión de diez errores.

■ Por el primero se sostiene que la corte erró al ordenar al secretario que tomara el juramento final a cada jurado y no a los doce en junto.

Los autos muestran que se fué llamando a los jurados para conocer del caso y después de haber prestado el juramento al efecto se les fué preguntando sobre sus cualidades para servir como tales. Se hicieron algunas recusaciones motivadas. Quedó finalmente un grupo de doce en condiciones de actuar.

Entonces la corte preguntó al fiscal si tenía alguna recusación perentoria que hacer. El fiscal recusó a uno. Y ocurrió lo que sigue:

"Juez.—La Defensa no tiene alguna recusación perentoria? Y la Corte va a hacer presente, tanto al Hon. Fiscal como al señor abogado-defensor, que en este juicio va a hacer uso de su discreción y ruego tanto al Fiscal como al abogado-defensor que hagan sus recusaciones perentorias en relación al Jurado, porque se procederá a tomar juramento definitivo después que se hagan las recusaciones perentorias ahora.—Abogado.—¿En cualquier momento se pueden hacer las perentorias? Juez.—No. En cualquier momento, no. Si el señor Fiscal tiene alguna recusación que hacer, que la haga ahora; si la tiene Ud., que la haga ahora, porque la Corte le va a tomar juramento definitivo a los señores jurados que queden. Abogado.— ¿La Corte no lo admitirá después? Juez.—Después, no. Abogado.— El señor Julio Pérez. Juez.—Puede, retirarse, señor Pérez. ¿No hay ninguna otra recusación por parte del Fiscal ni de la Defensa?— Fiscal.—No, señor Juez. Acepto los caballeros. Abogado.—Todavía no he terminado. El señor Armstrong. (Enrique)—Juez.—Puede retirarse, señor Armstrong. Abogado.—P.—¿Usted es don Jaime Rullán?.—R.—Sí, señor.—P.—¿De qué edad me dijo que eran sus niñas?—R.—Catorce años y diez y ocho años.—Abogado.—El señor Rullán.—Juez.—Puede retirarse, señor Rullán. Abogado.—P.—¿Su nombre?—R.—Julio Emmanuelli.—P.—¿Usted me dijo que tenía hijas?—R.—De ocho años.—Juez.—Tengan la bondad los señores jurados de ponerse de pie y prestar juramento definitivo en cuanto al presente caso. (El señor Secretario toma juramento definitivo a los

señores jurados que no han sido recusados por las partes, los cuales ascienden a cinco.)    Abogado.—Nosotros, señor Juez, vamos a suplicar a la Corte que se nos permita tomar una excepción a la resolución de la Corte.   No está constituido el jurado de doce hombres y se le ha tomado juramento a cinco caballeros jurados—juramento definitivo: por eso tomamos excepción.''

Se insacularon entonces siete jurados para completar el panel. Fueron ampliamente examinados por la defensa. Tanto el fiscal como la defensa hicieron recusaciones perentorias. Preguntó la corte si tenían alguna recusación más. Contestaron que no y ocurrió lo que sigue:

''Juez.—La Corte adopta igual resolución, porque entiende que hay suficiente razón para que se adopte esa regla, a virtud de lo dispuesto por nuestro Tribunal Supremo en el caso del *Pueblo de Puerto Rico* vs. *Vázquez,* 20 Decisiones de Puerto Rico, página 361, y el secretario procederá a tomar juramento definitivo a los cuatro señores jurados.—Abogado.—Igualmente, con la misma excepción nuestra.—Juez.—Si S. S. quiere demostrar que hay algún abuso de discreción, la Corte está dispuesta a oírle; porque en ese caso la Corte tendría sumo gusto en oírle sobre el particular, para poder rectificar, si así procediere, y ordenaría que estos señores jurados se retiraran.—Abogado.—Tengo dudas sobre si se puede parcialmente tomarle juramento a un jurado.—Juez.—Por eso la Corte ha citado el caso del Pueblo de Puerto Rico vs. Vázquez, 20 Decisiones de Puerto Rico, página 361.   Si S. S. cree que puede convencer a la Corte, la Corte ordenará que se retiren los señores jurados, para oír con gusto al letrado y rectificar su opinión, si así procediese.—Abogado.—Solamente que tengo dudas.''

Tomó el secretario el segundo juramento a los cuatro jurados que quedaron e insaculó tres más. Fueron examinados. Se recusó uno motivadamente y ocurrió lo que sigue:

''Juez.—¿Perentorias?—Abogado.—Ninguna.—Juez.—Presten juramento definitivo los dos señores jurados que quedan ahí.—Abogado.—Con nuestra excepción también.''

Se insaculó un jurado más, y ocurrió lo que sigue:

''Juez.—¿Perentoriamente?—Fiscal.—Acepto al caballero.—Abogado.—Acepto al jurado.—Juez.—Tenga la bondad el último señor

jurado de ponerse de pie y prestar juramento definitivo para conocer del presente caso.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"(La Corte se declara en receso.)—Juez.—Reanude la sesión, Márshal. A los señores del jurado que pueden pasar para ocupar sus sitios todos.—(El Jurado regresa al salón de sesiones.)—Juez.— Dé lectura a la acusación, Secretario.—Abogado.—Nosotros queremos tomar excepción, estando el jurado ya constituido, por no haberle sido tomado el juramento a todos en común y sí parcialmente."

En el caso de *El Pueblo* v. *Vázquez*, 20 D.P.R. 361, 366, invocado por la corte sentenciadora, esta corte se expresó así:

"Alega también el apelante que la corte erró al no obligar al Fiscal a hacer sus recusaciones en el acto en que se presentaba cada jurado. Parece que el Fiscal pospuso sus recusaciones perentorias y la Corte admitió tal procedimiento, concediendo igual derecho a la defensa.

"El artículo 221 del Código de Enjuiciamiento Criminal dispone que la recusación deberá hacerse al presentarse el miembro del jurado, y antes de que se le tome juramento para entender en la causa, y dispone también que, si para ello hubiera razón, el tribunal puede permitir que esto se haga después del juramento y antes de que el jurado se complete.

"Todo jurado presta dos juramentos, uno para contestar las preguntas que se le hagan con respecto a su capacidad para servir como tal y otro para actuar especialmente en la causa que se va a juzgar. Indudablemente que el juramento a que se refiere el artículo 221 del Código de Enjuiciamiento Criminal que hemos citado, es el segundo.

"Al parecer el procedimiento adoptado por el Fiscal en este caso no siguió estrictamente lo prescrito en la ley, pero no consta que estuviera en completa oposición a la misma, pues si bien se consigna que el Fiscal pospuso sus recusaciones perentorias, no se demuestra que tal posposición se hiciera para después de haberse tomado juramento al jurado para actuar en la causa.

"Además, como hemos visto, la misma ley autoriza al juez para variar el orden que prescribe, cuando existen razones suficientes para ello, y como la jurisprudencia ha establecido que los jueces pueden resolver estas cuestiones ejercitando una sana discreción, People v. Montgomery, 53 Cal. 576; People v. Rodríguez, 10 Cal. 50; People

v. Durrant, 116 Cal., 179, 197, tendría que demostrarse que la corte había abusado de su poder discrecional, para que el error que pudiera haber tal vez cometido sirviera de base a la revocación de la sentencia.

"Y por último, como bien dice el Fiscal de esta Corte Suprema en su alegato, 'el récord no demuestra que, después de resolver la corte la moción de la defensa y de invocar la regla que debía observarse en el empleo de las recusaciones perentorias por el Fiscal, éste hubiere recusado perentoriamente a ningún jurado, y no apareciendo así del récord, aun en el caso de que la corte hubiera incurrido en algún error, éste hubiera sido inmaterial, por no perjudicar ningún derecho substancial del apelante."

Examinados los hechos de este caso a la luz de la ley y de la jurisprudencia tal como surge de la decisión citada no cabe sostener que se cometiera error alguno por la corte de distrito.

Recientemente, en el caso de *El Pueblo v. Rivera*, 37 D. P.R. 760, esta corte dió una interpretación liberal al artículo 221 del Código de Enjuiciamiento Criminal, así:

"Es evidente que el sentido de la ley no es el de restringir fuertemente el derecho de recusación, que se relaciona con el de que el acusado sea sometido a un juicio imparcial y justo. Por eso no puede interpretarse la frase 'al presentarse el miembro del jurado' en el sentido de que, en el mismo acto de la presentación ha de hacerse la recusación, y más aún cuando se trata de la perentoria, a la que tiene que preceder la recusación motivada.

"Las limitaciones que el artículo citado expresa son las que se refieren a que la recusación se haga antes de tomarse el juramento al jurado para entender en la causa, y antes de que el jurado se complete."

No obstante esa interpretación liberal, creemos que debe subsistir la conclusión a que anteriormente llegáramos. En el caso de Rivera, *supra,* la corte de distrito impuso una regla contraria a la misma elasticidad que fija el propio artículo para permitir la recusación aun después de tomado el juramento, y mantuvo inflexible dicha regla cuando el acusado que no había agotado sus recusaciones intentó ejer-

citar su derecho haciendo una. En este caso conocemos la actitud de la corte, abierta a toda sugestión, y el acusado no trató de hacer ninguna recusación perentoria que la corte le negara, ni ha alegado perjuicio, habiendo en verdad aceptado el jurado que lo juzgara, limitándose a levantar la cuestión como una de derecho.

El procedimiento más sencillo y que se ajusta mejor a la interpretación liberal del artículo 221 contenida en el caso de *El Pueblo* v. *Rivera, supra,* es el de insacular el número suficiente de jurados y tomarles el primer juramento. Acto seguido se procede a su examen y a las recusaciones motivadas. Luego a las perentorias. Si no hay recusaciones, se les toma el segundo juramento a todos. Si las hay, sin tomar el segundo juramento a los que queden, se insaculan nuevos y se sigue el mismo procedimiento. Cuando las partes aceptan finalmente el jurado o no hay más recusaciones motivadas y el número de las perentorias a que se tiene derecho se ha agotado, entonces se procede a tomar a todos los jurados a la vez el segundo juramento.

█ El segundo error se señala así: "Cometió error la corte inferior en no permitir las repreguntas a la testigo Cristeria Rosario e insinuar a ésta la forma en que tenía que declarar."

Para basar su error el apelante transcribe en su alegato, los dos incidentes que siguen:

"P.—Y cuánto tiempo estuvieron ellos allí?—Juez.—Si usted puede contestar, conteste.—Fiscal.—Le ha estado preguntando eso diez veces.—Juez.—Yo sé la tortura moral a que se puede someter a una testigo. Puede tomar excepción, si gusta. Conteste pura y exclusivamente lo que sepa. Si usted no puede contestar con precisión qué horas, qué minutos, puede contestar: 'Poco tiempo', 'Bastante tiempo', porque Ud. no está obligada a dar más explicación.— Abogado.—Tomo excepción de las instrucciones que le da el señor Juez a la testigo."

  ✽  ✽  ✽  ✽  ✽  ✽  ✽

"P.—A la parte acá del puente hay casas de familia?—R.—Ahí no le puede decir porque no ando por ahí casi nunca.—P.—Usted no

ha visto ese barrio?—R.—He visto casas, pero no sé si son de familia.—P.—Hay casas?—R.—Hay casas.—P.—Hay comercios?—R.—No puedo dar cuentas porque no conozco eso.—P.—Cuántas casas hay a la parte acá del puente?—R.—No las he contado.—P.—Más o menos. —R.—No le puedo decir.—P.—Más o menos. Hay más de tres?—R. —No puedo decir.—Juez.—Ya ha dicho que no puede decir.—Abogado.—Vamos a ver si puede decir.—Juez.—Es una tortura moral tremenda a la que se somete a esta testigo.—Abogado.—Estamos en la repregunta. Nosotros podemos ser más sugestivos.—Juez.—La Corte ha estado observando en la forma como se ha estado examinando a la testigo. La Corte se va a declarar en receso para que pueda recobrarse de la tortura moral a que ha estado sometida. Y es mi deber en estos momentos advertir a los señores del Jurado que no deben hablar entre sí ni permitir que persona alguna se les acerque y les hable de este procedimiento por ahora. Sosiéguese, tranquilícese, y después contestará las preguntas del abogado defensor.— Abogado.—El abogado toma excepción. La testigo está contestando b'en las preguntas, está tranquila.—Juez.—La Corte ha estado observando a la testigo y lo hace así constar.—Abogado.—Tomo excepción de la actitud de la Corte.''

Invoca el apelante en su apoyo lo resuelto por esta Corte Suprema en el caso de *El Pueblo* v. *Aponte*, 26 D.P.R. 604, 605, así:

''Convenimos con el fiscal en que el poder de una corte para impedir que se repitan las mismas preguntas, está bien reconocido. El juez debe velar (38 Cyc. 1315) porque el examen de los testigos sea llevado a efecto de modo ordenado, y una gran discreción se le confiere para controlar dicho examen. 'Completas y escudriñadoras repreguntas deben permitirse,' dijo la Corte Suprema de Georgia en el caso de Alabama Const. Co. v. Continental Car, 62 S. E. 160, 162, pero esto no quiere decir que el abogado tenga un derecho sin restricción alguna a repetir preguntas hechas a un testigo. El juez puede restringir las repeticiones inútiles e innecesarias.''

''Pero hemos examinado detenidamente la declaración del testigo de que se trata, y hemos llegado a la conclusión de que las repreguntas que el abogado del acusado pretendió hacerle, no habían sido en realidad de verdad hechas ni contestadas anteriormente. Y siendo esto así, es evidente que la corte de distrito se extralimitó en sus facultades y negó al acusado el derecho fundamental que le reconoce el artículo 11 del Código de Enjuiciamiento Criminal, en su número 4.''

Para poner de manifiesto la conducta del juez de distrito sobre este extremo, sería necesario transcribir las repreguntas todas de las cuales surge la necesidad de su intervención. Aun leyendo fríamente el récord se aprecia que el abogado defensor se excedió en sus derechos. En el caso de Aponte, *supra,* si se revocó la sentencia fué porque las repreguntas que intentó hacer el abogado y que negó la corte no habían sido en realidad de verdad hechas ni contestadas anteriormente. Aquí no existe tal cosa. La declaración de la perjudicada ocupa 57 páginas de la transcripción y se trata de hechos que pudieron narrarse con todos sus detalles en ocho o diez páginas. El primer incidente de que se queja el apelante consta en la página 29 de la declaración y el segundo en la 32.

Parece conveniente transcribir los artículos 151 y 165 de la Ley de Evidencia. Dicen así:

"Art. 151.—El tribunal ejercerá razonable intervención en el modo de hacerse las preguntas, a fin de que resulten en lo posible tan rápidas, claras y poco enojosas para el testigo, como eficaces para la extracción de la verdad; pero dentro de esta regla las partes podrán hacer las preguntas pertinentes y legales que juzgaren oportunas. El tribunal, no obstante, podrá suspender la presentación de nueva evidencia respecto a determinado punto, cuando la evidencia ya presentada fuere tan completa que no diere lugar a duda."

"Art. 165.—Un testigo tiene derecho a que se le proteja contra las preguntas no pertinentes, impropias o insultantes, y contra toda conducta áspera u ofensiva; a que se le detenga sólo durante el tiempo que exija el interés de la justicia; a que se le examine sólo sobre materias legales y pertinentes a la cuestión."

La corte debe ser muy cuidadosa en el cumplimiento de estos deberes y hacer uso de su poder sólo en casos verdaderamente necesarios. De otro modo, quizá por una actuación innecesaria, puede darse lugar a la revocación de una sentencia enteramente justa en el fondo.

Por el tercer error se sostiene que la corte no debió admitir como prueba ciertas piezas de ropa presentadas.

Las piezas de ropa fueron reconocidas como suyas por la perjudicada y como las que llevaba puestas y fueron rotas por el acusado cuando ocurrió el suceso. Declaró además la perjudicada que el hecho se cometió en la madrugada de un domingo y las ropas en cuestión fueron entregadas por ella a la policía el lunes siguiente.

Bajo esas circunstancias no creemos que se cometiera error alguno al admitir la prueba.

█ Tampoco fué cometido el cuarto de los errores señalados. Declaró la perjudicada en el juicio que después del hecho desaparecieron el acusado y Domingo Torres "y yo, como a las tres de la mañana, como Dios me ayudó, salí a la casa de la señora Juana Echevarría (de la cual la habían sacado poco antes el acusado y Torres por medio del engaño y la violencia) y le conté lo que me pasó." La corte admitió luego la declaración de la señora Echevarría y el apelante sostiene que erró. Dicha declaración era admisible por ser parte de la *res gestae. El Pueblo* v. *Arenas Alemañy,* 39 D.P.R. 16, *El Pueblo* v. *Calventy,* 34 D.P.R. 390.

█ El quinto error se formula así: "Igualmente erró la corte inferior al admitir la declaración de referencia del testigo Jaime González, Jefe de Distrito de la P. I. y que declarara además sobre el carácter de unos arañazos."

Para examinar este error, que es el que en verdad nos ha hecho vacilar en la resolución de este caso, parece conveniente transcribir íntegra la declaración impugnada. Es así:

"DECLARACIÓN DE JAIME GONZÁLEZ.—Fiscal.—P.—Cómo se llama, testigo?—R.—Jaime González.—P.—A qué se dedica usted?—R.—Soy Jefe de Distrito de la Policía Insular.—P.—Dónde presta usted servicios?—R.—En Juana Díaz.—P.—Cuánto tiempo hace que presta servicios como Jefe de la Policía en Juana Díaz?—R.—Cinco años.—P.—Allá por el día primero o el día dos—el día dos usted tuvo conocimiento de un hecho que ocurriera en Juana Díaz, en el cual estaba inmiscuido este acusado?—R.—Sí, señor.—P.—Usted vió a Cristeria Rosario?—R.—A Cristeria Rosario, sí, señor.—P.—La vió?—R.—Sí, señor.—P.—Antes, o después del hecho ese?—R.—Después.—P.—Qué día fué que usted la vió a ella?—R.—Me parece que fué el día dos;

del dos al tres.—P.—Pero, qué día de la semana?—Usted recuerda? —R.—Sería entre lunes y martes.—P.—Con quién vino ella al pueblo?—R.—Vino con una señora llamada Juana Echevarría.—P.—Ella vino por su propia voluntad, o alguna persona la mandó a buscar?— R.—Ella vino.—Juez.—P.—A dónde?—R.—Al cuartel.—Fiscal.—P.— Usted vió esa muchacha?—R.—La ví.—P.—Le notó algo usted a esa muchacha?—R.—Sí, señor.—Abogado.—Que se elimine la contestación.—Si los señores del Jurado la han oído, que la borren de sus mentes.—Juez.—La Corte no ha oído nada de lo que ha dicho el testigo. Si la hubiera oído, tendría que decir: 'Ya contestó; es tarde.'— Abogado.—Nos vamos a oponer porque dice que fué dos o tres días después que vió a esta muchacha y que declaró ante él.—Fiscal.—No es lo que ella declaró, sino lo que él vió.—Abogado.—Lo que vió? Nos oponemos, porque no forma parte del *res gestae*. Si una supuesta perjudicada en un caso de violación va inmediatamente que se haya cometido el hecho donde una persona y ve esa persona algo en esa perjudicada, eso es admisible; pero si esa observación tiene lugar dos o tres días después, presente lo que presente la perjudicada, presente las huellas que presente, no es admisible una declaración sobre eso, porque es muy tarde y ya no forma parte del res gestae.— Fiscal.—Sr. Juez, yo creo que es perfectamente admisible.—Si el Jefe de la Policía vió a esa muchacha y encontró cualquier huella, él puede decir que vió tal cosa y tal cosa; en otras palabras, corrobora a la perjudicada que dice que tenía huellas en el cuello.— Juez.—La Corte admite la declaración del Jefe sobre esos extremos.— Abogado.—Tomamos excepción, y la vamos a fundamentar en la declaración del testigo, que dice que dos o tres días después de los hechos fué que vió a esta muchacha, y en el caso del *Pueblo de Puerto Rico* vs. *Maldonado*, 17 Decisiones de Puerto Rico, páginas 23–29.— Juez.—La Corte admite la pregunta o la declaración del testigo sobre esos extremos.—Fiscal.—P.—Explíqueles a los señores del Jurado lo que usted vió, si vió algo, en esa muchacha? Abogado.—Con nuestra oposición, y que se entienda, para no molestar al testigo y a la Corte, objetada toda la declaración del Jefe de la Policía señor González, y excepcionada por los mismos fundamentos.—Testigo.—Yo observé que ella tenía como unos rasguños aquí en la parte derecha del cuello. —Fiscal.—Nada más.—Abogado.—Nada—Juez.—Dígame una cosa, señor: usted dice que vió a esta mujer llamada Cristeria Rosario?— R.—Sí, señor.—P.—Que usted la vió allá entre el día dos o tres de enero?—R.—Sí, señor.—P.—O sea entre un lunes y un martes?—R.— Y un martes.—P.—Y que usted observó que esa mujer tenía algo.

Qué tenía esa mujer?—R.—Tenía como unos arañazos aquí en la parte esta.—P.—Eran arañazos, o como unos arañazos?—R.—Unos arañazos.—P.—Usted puede afirmar que eran arañazos?—R.—Sí. Parece que ella había tenido lucha con alguien.—Abogado.—Deseamos que la Corte instruya al Jurado que esas manifestaciones: 'Parece que ella había tenido lucha con alguien,' deben borrarlas de sus mentes.—Juez.—Sí. Que se eliminen esas manifestaciones. Deben borrarlas de sus mentes, señores del Jurado.—Juez.—P.—Una cosa es contestar afirmativamente, y otra es: Me parece. Qué fué lo que vió en esa mujer?—R.—Como arañazos.—P.—Cómo estaban esos arañazos?—R.—Estaban en este lado derecho del cuello.—P.—Cómo se encontraban esos arañazos? Estaban sangrando?—R.—No, señor. Ya estaban secos.—P.—La forma de esa sequedad de esos arañazos denotaban—si puede decirle a la Corte—si eran recientes o de algún tiempo? Qué puede decirle a la Corte y a los señores del Jurado sobre eso?—Abogado.—Con el permiso de la Corte. Perdóneme la Corte. El testigo no puede declarar sobre eso porque no es un perito médico.—Juez.—Es un observador. Él ha dicho que vió arañazos. La Corte cree que él puede decirle a la Corte y a los señores del Jurado la forma que tenían esos arañazos, a ver si eran recientes.—Abogado.—Tomamos excepción.—Juez.—Conteste.—Testigo.—Denotaban que eran recientes.—Juez.—P.—Por qué dice usted que eran recientes? No tiene ninguna causa ni razón alguna usted para poder decir que eran recientes?—Abogado.—Respetuosamente nos oponemos a la pregunta de S. S.—Juez.—Conteste, testigo.—Abogado.—Tomamos excepción.—Juez.—Por qué dice usted que eran recientes?—R.—Porque tenía la sangre coagulada por aquí.—P.—Sangre acumulada?—R.—Sí, como cuando aprietan así a uno.—P.—Pero cuando aprietan a uno lo que hay es la huella de la contusión, la moratura, que queda morado, mientras que el arañazo es como una herida, una herida casi incisa. Qué es lo que tenía esa mujer: heridas así de unos arañazos, o una presión?—Abogado.—Con el debido respeto, nos queremos oponer. S. S. está preguntando, pero no tenemos más remedio que oponernos porque son preguntas sugestivas las hechas por el señor Juez al declarante, que es un testigo inteligente, Jefe de Distrito de la Policía, y es un testigo del Pueblo de Puerto Rico.—Juez.—Puede usted contestar.—Abogado.—Nosotros tomamos excepción.—Testigo.—Sí, ella tenía la sangre coagulada y además unos arañazos; tenía las dos cosas en la parte derecha de la garganta.—Juez.—Puede continuarse en el examen del testigo, si así se desea, por el Fiscal.—Fiscal.—Nada más.—Juez.—P.—Usted detuvo a este acusado?—R.—

Sí, señor. Se detuvo.—P.—Cuando usted detuvo a este acusado, él le hizo alguna manifestación en relación al hecho?—Abogado.—él dice: 'Se detuvo'.—Juez.—'Usted detuvo al acusado?' no fué la pregunta?—Abogado.—Sí, señor. Y él contestó: 'Se detuvo.'—Juez.—P.—Cuando se detuvo a este acusado, fué llevado a su presencia?—R.—Sí. Yo estuve hablando con él.—P.—Cuando usted habló con él, a este acusado usted le hizo alguna pregunta, o hizo él alguna manifestación en relación a los hechos que estamos investigando hoy? —R.—No. señor.—Fiscal.—Ese es el caso del Pueblo de Puerto Rico. Juez.—La Corte ha estado haciendo todas estas preguntas porque entiende que así como es deber de la Corte proteger a un testigo, es su deber también proteger los derechos del acusado.''

Para sostener que se trata de una prueba de referencia, se invoca la decisión de esta corte en el caso de *El Pueblo* v. *Maldonado,* 17 D.P.R. 23.

A nuestro juicio el caso no es aplicable. No se trata de prueba de referencia. González no declaró sobre manifestaciones que se le hicieran, sino sobre algo que él mismo observó.

Con respecto al segundo extremo del señalamiento de error, el apelante sólo hace la siguiente cita en su alegato. Dice:

"En Cyc. 33, página 1471, está resuelto lo siguiente:
" 'Un médico puede testificar sobre la condición física de la perjudicada, por un examen hecho después que el crimen se cometió, *pero si el examen ha sido remoto a la fecha de la ofensa, este hecho afecta a su fuerza probatoria.*—Cuando el examen ha sido hecho en una fecha distante y han podido ocurrir durante ese tiempo otros actos sexuales con otro hombre esa evidencia no es admisible.' ''

La cita no es enteramente aplicable. Un arañazo es algo que cualquier persona puede apreciar. Se trataba de un policía y por lo tanto de una persona de experiencia.

Lo que realmente llama la atención es la conducta del juez. ¿Qué necesidad había de su intervención? No hay duda alguna que los jueces pueden intervenir en el esclarecimiento de los hechos. Muchas veces una sola pregunta que va al fondo de la cuestión, desentraña y pone de manifiesto

la verdad, pero generalmente no deben intervenir. Aquí el juez claramente se excedió y puso en peligro toda su labor. Sólo el espíritu de justicia parece que lo animaba, pero la justicia de un juez debe procurarse que sea lo más serenamente posible que nuestra imperfecta naturaleza humana permita. Sin embargo, no creemos que la extralimitación lleve necesariamente consigo la revocación de la sentencia, atendidas todas las otras circunstancias que concurren.

El sexto error carece de importancia y los errores séptimo y octavo fueron renunciados por el propio apelante en su alegato.

Por el noveno error se discute en general la conducta del juez sentenciador como perjudicial al acusado y por el décimo se sostiene que la prueba no es suficiente.

Ya nos hemos referido dos veces a la conducta del juez y hemos consignado en una nuestra vacilación sobre la resolución que debíamos adoptar. Después de un cuidadoso estudio, no creemos que dicha conducta tuviera influencia alguna en el veredicto. del jurado. Las instrucciones del juez fueron muy amplias y justas para ambas partes.

En cuanto a la prueba a nuestro juicio es evidente. Oigamos a la perjudicada Cristeria Rosario.

No era una mujer virgen. Había sido desflorada hacía algún tiempo por otro hombre y últimamente había convenido en irse a vivir maritalmente con Ramón Rodríguez. Este la llevó a la casa de Juana Echevarría que vivía cerca del pueblo de Juana Díaz y allí la dejó la víspera de año nuevo (31 de diciembre, 1926), para irla a buscar al día siguiente. Cristeria y Juana se acostaron y entonces ocurrió lo que sigue que trataremos de exponer siguiendo las exactas palabras usadas por la testigo:

"Pues lo que pasó fué que después que estábamos acostadas ya, como a las nueve o las diez de la noche, llegó uno primero llamando a la casa; que si el señor Ramón Rodríguez estaba allí. . . . . Llamó, que si le hacía el favor de decirle la señora Juana si Ramón Rodríguez estaba allí y entonces ella le contestó que allí no estaba Ramón

Rodríguez .... y entonces se retiró y se fué; y cuando entre diez y once llegaron llamando a nombre de la policía .... De la policía de Juana Díaz y entonces la señora Juana le contestó .... que por qué tenía que ir la policía allí, y entonces le dijeron que motivado con una muchacha que tenía Ramón Rodríguez allí y unos desórdenes que había dado Ramón; y entonces ella le dijo que no podía abrir la puerta y entonces le dijeron que llevaban mandamiento del Juez de Juana Díaz .... Que con la policía no se necesitaba tanto y ella le dijo que no se le podía abrir la puerta a aquella hora, y que si algo pasaba, ella por la mañana se presentaría al cuartel o si no que fueran a buscar a Ramón Rodríguez a la casa de él y le dijeron que si no a la buena, a la mala, .... Entonces ella se levantó y abrió la puerta, y al levantarse y abrir la puerta, pidieron que me presentara yo .... Ella me dijo que le hiciera el favor de darle el quinqué y cuando le traje el quinqué, ella los conoció a los que eran, y cuando le dí el quinqué, ella, bueno no quedó en mundo .... No quedó en mundo, pero los vió. Cuando conoció que no eran policías, entonces ella se atemorizó y entonces me echaron mano a mí .... Ellos—los que estaban allí me echaron mano y me trajeron y dijeron que tenían a Ramón Rodríguez arrestado en el puente en un carro .... El señor éste, señalando al acusado, era uno de ellos .... Como yo no encontré allí a Ramón Rodríguez arrestado en el puente, como ellos decían, yo les dije que ellos no eran policías nada, que por qué motivo era ése que me habían ido a sacar de la casa de la señora Juana Echevarría, y entonces yo acometí a correr para irme y entonces brincaron y me echaron mano. ... Entonces yo luchaba por irme y no podía, no pude, y cuando yo luchaba por irme, ellos me apretaban y entonces me cogieron y me metieron allí a una pieza de caña, y de la pieza de caña me llevaron a un sitio de un trillo que hay más abajo .... Entonces después tuvieron uso carnal conmigo; entonces se desaparecieron y se fueron, y yo, como a las tres de la mañana, como Dios me ayudó, salí a la casa de la señora Juana Echevarría y le conté lo que me pasó. .....''

Reconoce al acusado como uno de los que tuvo actos carnales con ella en la forma descrita. Detalladamente sigue explicando la violencia del acto y cómo le destrozaron la ropa que llevaba puesta y cómo dió cuenta, el lunes, con Juana Echevarría, del suceso a la policía.

Sometida a un largo y en varias ocasiones abusivo interrogatorio, se sostuvo siempre en lo dicho. La defensa

impugnó su veracidad presentando una anterior declaración prestada por ella en el juicio que ya se había celebrado contra Torres. Se advierten en verdad contradicciones en cuanto a la manera como actuó Torres en ciertos momentos, pero no en cuanto a Munera.

La testigo Juana Echevarría corrobora en todos sus extremos la declaración de la perjudicada. Dijo, en parte, así:

"Lo que pasó fué que me hicieron levantar, llamando: 'Dueña de casa, dueña de casa, dueña de casa, dueña de casa.' Yo dije: 'Qué pasa? Qué se le ofrece?' Me dijeron entonces: 'La policía'. Y yo dije: '¿Qué se le ofrece a la policía?' Y entonces dijeron: 'Un mandamiento de arresto por el Juez y el Jefe, y que motivado a esa mujer que Ramón tiene ahí, ha hecho muchísimos desórdenes por el Guayabal y nosotros venimos con un mandamiento de arresto del Jefe y del Juez.' . . . . Que me levantara. A Cristeria y a Ramón. Que me levantara, que había que hacer unas investigaciones. Yo les decía que aguardaran para mañana, y ellos que no, que era un mandamiento de arresto por el Juez y el Jefe, que me levantara ligero porque me convenía. . . . . Yo me levanté; al levantarme, abrí la puerta, y al abrir la puerta, me hicieron llamarla, y yo la llamé . . . Y yo la llamé, y ella se levantó y vino, y les decía que lo hicieran por su madre, que ella iría mañana, y decían que no, que había que llevarla a ese pueblo de todos modos. . . . . Y entonces ella les decía, rogándoles y suplicándoles, que le fueran a buscar a Ramón, y volvían y le contestaban lo mismo; y yo le dije: 'Cristeria, dame acá el quinqué para presenciar quiénes son, y entonces yo he reparado quiénes eran. . . . . Pues, eran este señor (señalando al acusado) y Domingo Torres. Pues entonces que yo reparé, que le dije; 'Cristeria, dame acá el quinqué,' ellos se alarmaron y ellos le echaron mano y se la llevaron. . . . . La muchacha volvió esa misma noche, como a las tres de la mañana. . . . . . Me llamó y yo me levanté, y entonces me contó lo que le había pasado."

No es necesario examinar el resto de la prueba. Basta con esas dos declaraciones, creídas como fueron por el Jurado, para sostener el veredicto de culpable que rindiera.

*Debe confirmarse la sentencia apelada.*