El Pueblo de Puerto Rico, demandante y apelado, *v.* José Márquez, acusado y apelante.

Núm. 10610.—*Sometido:* Diciembre 6, 1944. *Resuelto:* Enero 9, 1945.

372

**Cruz Ortiz Stella**, abogado del apelante; **R. A. Gómez, Fiscal del Tribunal Supremo**, abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

José Márquez y Julio Delgado fueron acusados de haber violado a Ana Adelina Cruz, realizando con ella actos carnales valiéndose de la fuerza y de la violencia. Fueron enjuiciados conjuntamente. El jurado absolvió a Delgado y trajo veredicto de culpabilidad contra Márquez, quien fué sentenciado a un año y medio de presidio con trabajos forzados. Apeló Márquez y señala tres errores, de los cuales, el de que el veredicto no está sostenido por la evidencia y no está de acuerdo con la ley, lo discutiremos a continuación por estimarlo bien fundado.

La perjudicada, una muchacha que a la fecha en que se cometió el alegado delito tenía catorce años y meses, declaró que vivía en un campo de Naguabo; que el día de autos, allá por el 9 de agosto de 1940, acompañada de dos amigas, Carmen García y Justina Molina, más jóvenes que ella, fué a buscar leña a un sitio llamado La Peña en el barrio donde vivía; que allí encontraron a Delgado, quien entabló conversación con ella; que dicho acusado, tocándola con la punta de un machete que portaba, le dijo, "¡A que te mató!", replicando ella, "¡A que no!"; que inmediatamente él le dijo que podía con ella, y acto seguido la agarró en sus brazos y entró con ella en la maleza, gritándole a las amigas que se fueran de allí y amenazándolas con matarlas

si decían algo; que las amigas se alejaron un poco, escondiéndose en un sitio desde donde podían observar lo que le hacían a ella; que mientras la llevaba Delgado ella forcejeaba pero que súbitamente el otro acusado, Márquez, salió de detrás de una roca donde estaba escondido, y entre los dos la acostaron en el suelo; que Delgado le puso un pañuelo en la boca y la sujetó, mientras Márquez tenía contacto carnal con ella; que cuando Márquez terminó, la sujetó y le tapó la boca con el pañuelo mientras Delgado realizaba el acto carnal; que cuando Delgado terminó, ambos acusados se fueron corriendo, advirtiéndole a ella que si contaba lo sucedido la mataban; que llegó a su casa acongojada, con la ropa despedazada y manchada de sangre, y al verla su madre, observando que caminaba con cierta dificultad, le preguntó lo que le pasaba, y ella le dijo, que la sangre procedía de la menstruación y que sentía los pies cansados.

Llamada a declarar Carmen García, dijo que conocía a Ana Adelina Cruz y a los acusados, a los cuales identificó. Inmediatamente después sucedió lo que en la siguiente forma aparece del récord:

"P. Hable duro. ¿Sabe algo en este caso? R. Sí, señor.

"P. Mire, dígalo en alta voz, duro, mirando a aquellos señores [refiriéndose al jurado], lo que Ud. sepa en este caso. Vamos a ver. R. Nosotras estábamos en el cerro, en una parte solitaria, éramos tres.

"P. Siga. Siga. ¿Qué pasó? [La testigo no contesta.]"

Desde ese momento la testigo se sintió enferma y no pudo continuar declarando. El fiscal la retiró en lo que se reponía y llamó a Justina Molina.

Luego de decir donde vivía, la declaración de Justina Molina continuó así:

"P. ¿Tú conoces a Ana Cruz? Habla con la boca, nena. R. La conozco.

"La Corte: ¿Puedes hablar un poco más alto? Mira, todo lo más alto que puedas, con calma, dirígete a estos señores, tranquila, no

hay más que declarar la verdad y nada más, con tranquilidad. Adelante.

"El Fiscal: ¿Tú conoces a Carmen García? R. Sí, señor. La conozco.

"P. ¿Tú conoces a Julio Delgado? R. Lo conozco.

"P. ¿Cuál de estos dos hombres que están aquí es Julio Delgado? R. El del lado de allá.

"P. ¿El que está en mangas de camisa? R. Sí, señor.

"P. ¿Tú conoces a José Márquez? R. Sí, señor.

"P. ¿Cuál es? R. El del traje azul marino.

"P. ¿Cómo le dicen a José Márquez, José Peña? R. José Peña siempre le dicen.

"P. Nena, ¿tú sabes algo en este caso? R. Yo no sé nada en este caso, yo los ví a ellos dos hablando.

"P. Alza la voz. ¿Tú los viste qué? R. Yo ví a José y a Ana Cruz hablando y yo, pues, llamé a Ana Cruz para que nos fuéramos para la casa y entonces ella no quiso irse y yo me fuí para mi casa y los dejé acá. No sé lo que pasó acá.

"P. ¿Uds. iban para dónde? R. Para ningún sitio, estábamos debajo de un árbol.

"P. ¿Quiénes estaban debajo de un árbol? R. Yo y Ana Cruz.

"P. ¿Y quién más? R. Carmen García.

"P. ¿De dónde salieron Uds. para ese árbol? R. De la casa, que estábamos buscando leña.

"P. ¿Como a qué hora era? R. Yo no recuerdo.

"P. ¿Era por la tarde, o por la mañana o al mediodía? R. De mediodía abajo.

"P. ¿Qué le pasó a Ana? R. Yo no sé lo que le pasó a Ana.

"P. ¿Tú viste a Julio Delgado? R. No, señor.

"P. ¿No viste a Julio Delgado allí? R. Yo no ví a Julio Delgado allí, yo al que ví allí fué a José Márquez.

"P. ¿Tú no te acuerdas haberme declarado a mí ahora? R. Yo no recuerdo, yo los ví a ellos; yo lo que digo que los ví a José y Ana Cruz hablando.

"P. Y a Julio Delgado, ¿no lo viste? R. A Julio Delgado no lo ví."

El fiscal trató de impugnar la declaración de Justina Molina llamándole la atención a la declaración jurada que había prestado ella durante la investigación del caso. Justina explicó por qué declaraba ahora en forma distinta a la en

que había declarado durante la investigación, diciendo que ella había declarado en la forma en que lo hizo durante la investigación a instancias de la madre de Ana Adelina, quien le había inducido a que declarase así, la había llevado a declarar sin el permiso de sus padres y hasta le había ofrecido un regalo si declaraba en esa forma, pero que ella en realidad no sabía nada de lo sucedido.

Llamada la testigo Altagracia Figueroa, madre de Ana Adelina, declaró que el día de autos su hija salió con dos amigas a buscar leña; que más tarde regresó con el traje roto y con manchas de sangre, y que observó que su hija caminaba con dificultad; que al preguntarle qué le había pasado, su hija contestó que sentía los pies cansados, y al interrogarla sobre la causa de las manchas de sangre, le manifestó que eran de la menstruación; que creyó lo que le dijo la hija, le quitó la ropa y la sentó en un baño de agua tibia; que durante los cinco días siguientes su hija continuó sangrando; que el 16 de agosto de 1940 José María Cruz, padre de Ana Adelina, mientras iba por un camino del barrio, pasó cerca de un grupo que se hallaba a la orilla del camino compuesto de Delgado, Márquez y otros, y que oyó cuando Delgado y Márquez decían "que Ana era una tonta y boba, que ellos se habían burlado de ella"; que al oír esto, Cruz volvió atrás, le contó lo sucedido y le indicó que investigase con su hija sobre el particular; que al hablar con su hija ésta le manifestó lo que le había sucedido con los acusados en el sitio La Peña, a lo cual nos hemos referido al reseñar la declaración de la perjudicada.

José María Cruz relató las manifestaciones que dijo haber oído de parte de Delgado y de Márquez, y declaró que las comunicó a su esposa en la forma declarada por ésta, y que luego de haber estado en su casa volvió al sitio donde había oído las supuestas manifestaciones de Delgado y de Márquez y dirigiéndose al primero, le preguntó qué le había pasado con su hija; que Delgado no le contestó, sino que dió

media vuelta y echó a andar; que entonces le dijo que iba donde el policía para que hiciese la investigación correspondiente, replicándole Delgado, "No, ¿a mí solo me va a denunciar?", a lo que Cruz contestó, "Uno solo no fué el del delito." Cruz fué donde el policía Gierbolini, quien lo llevó a la fiscalía, y al día siguiente condujo a su hija donde el doctor Mejías para someterla a un examen.

Declaró el doctor Mejías que el 17 de agosto de 1940 examinó los órganos genitales de, la perjudicada, encontrando que se hallaba completamente desflorada. A preguntas de la corte contestó que no podía precisar más o menos la fecha en que tuvo lugar la desfloración; que cuando hay una desfloración reciente por lo regular durante los primeros diez días los órganos genitales demuestran hiperemia de los labios y rasguños que no están cicatrizados, y al examinar a la paciente por lo general está muy adolorida; que en el caso de Ana Adelina Cruz el himen estaba completamente cicatrizado, ella no demostraba sentir dolor en ninguna forma al ser examinada y admitía dos dedos en el canal vaginal sin dolor alguno. Declaró además el perito que él llamaría una desfloración reciente la que no tuviera más de ocho días de haberse realizado, y preguntado por el fiscal si a los ocho días de la desfloración puede haber cicatrización, contestó el doctor: "Sí, señor, pero ya está casi lo que llamamos cicatrizada, pero no está . . ."

Luego de esta prueba el fiscal anunció a la corte que cerraba su caso y que no ponía a declarar a Carmen García porque se hallaba en un estado de postración. Por orden de la corte el márshal fué a verla y a preguntarle si estaba en condiciones de venir a declarar, manifestando el márshal que la testigo se hallaba muy nerviosa y no podía declarar.

La defensa presentó una moción de *nonsuit,* y declarada sin lugar, procedió a presentar su prueba.

Declaró en primer término Fernando Ubiles, quien manifestó que en varias ocasiones vió a Márquez y a Ana Ade-

lina Cruz realizando actos carnales alrededor del sitio donde se alega se cometió la violación, y que en otras ocasiones los vió bañándose desnudos en el río.

Márquez declaró que conoció a Ana Adelina Cruz desde que era una niña pequeña; que siendo ya bastante crecida estuvo alquilada en Santurce, regresando nuevamente a su casa en el mes de junio 1940; que muchas veces el acusado le decía "¡Adiós!" y la galanteaba; que en cierta ocasión Ana Adelina Cruz se dirigía a una clínica que hay en la central a curarse un pequeño golpe y yendo él para el mismo sitio, la acompañó; que siguió enamorándola y la invitó a un matinée; que ella aceptó la invitación, y al regreso, como las guaguas llegaban tarde, la acompañó hasta la casa de ella; que la tocó varias veces sin protesta por parte de ella; que al día siguiente, estando ella sola lavando en el río, él fué a bañarse, y ella lo llamó; que al acercarse, ella le manifestó que tenía un secreto, que no se lo dijera a nadie, que mientras ella estaba por Santurce "le había sucedido un fracaso con un hombre"; que después de comunicarle el secreto, la invitó a realizar actos carnales, a lo cual accedió ella; que ésa fué la primera vez que los realizaron; que después de esa ocasión se encontraban a menudo; que muchas veces ella iba a buscarlo a la finca donde él vive; que por lo regular lo citaba para el mismo sitio donde ella acostumbraba lavar, y así tuvieron oportunidad de realizar actos carnales cinco o seis veces; que un día, después de realizar el acto carnal, se bañaron desnudos en el río; y que continuaron realizando los actos carnales hasta principios de agosto. Negó que la hubiere violado, y afirmó que en las ocasiones en que habían tenido contacto carnal lo había hecho ella por su propio gusto, por lo que no tenía él necesidad de violarla.

Delgado, el otro acusado, declaró que nunca había realizado actos carnales con Ana Adelina Cruz; que él la enamoraba y que en cierta ocasión ella lo requirió para que se la

llevara, pero que él le dijo que no podía ser, que aguardara a ver si las cosas cambiaban y le podía alquilar un cuarto, y que de ahí no pasaron sus relaciones; que es falso lo que declaró Ana Adelina Cruz con respecto a la violación.

Tal fué la prueba que tuvo ante sí el jurado.

No hay duda alguna de que Ana Adelina Cruz había sido desflorada. Ella declaró que la habían desflorado los dos acusados. Si en un caso de violación la sola declaración de la perjudicada, de ser creída por el jurado, bastara para sostener el veredicto, la evidencia en este caso sería suficiente. Pero la ley requiere que la declaración de la perjudicada en casos de violación sea corroborada. Código de Enjuiciamiento Criminal, art. 250. Al igual que en la corroboración exigida para que las declaraciones de los cómplices sean admisibles, no es necesario en casos de violación que la evidencia corroborativa pruebe todos los elementos del delito, pero sí es indispensable que tienda a conectar al acusado con la comisión del crimen. *El Pueblo* v. *Maldonado,* 17 D.P.R. 23; *Pueblo* v. *Vázquez,* 40 D.P.R. 258; *Pueblo* v. *Feliciano,* 53 D.P.R. 423. En ciertos delitos, especialmente en el de violación a los efectos de conectar al acusado con la comisión del delito, en varias jurisdicciones de los Estados Unidos son admisibles en evidencia las espontáneas manifestaciones que en la primera oportunidad que tuviere la persona perjudicada hiciere a otras personas con respecto a lo que le ha sucedido con el acusado. Esa doctrina prevalece en esta jurisdicción. *El Pueblo* v. *Maldonado,* supra; *El Pueblo* v. *Anglada,* 20 D.P.R. 12; *Pueblo* v. *Arenas,* 39 D.P.R. 16; *Pueblo* v. *Munera,* 39 D.P.R. 295; *Pueblo* v. *Blanco,* 40 D.P.R. 130; *Pueblo* v. *Vázquez,* supra; *Pueblo* v. *Fuentes,* 63 D.P.R. 44, 50.(¹)

---

(¹)Conviene aclarar ciertas manifestaciones de este Tribunal contenidas en el siguiente párrafo de la opinión emitida en el caso de *Pueblo* v. *Fuentes,* supra, pág. 47:

"Independientemente del relato hecho por la niña a la madre, cinco días después del suceso, la declaración de la madre y la del médico son, a nuestro

■ La prueba de corroboración que tenemos en el presente caso tendente a conectar al acusado con la comisión del delito consiste de: (1) la declaración de la madre de la perjudicada, al relatar lo que su hija le manifestó el 16 de agosto de 1940 cuando el padre vino a su casa y le manifestó lo que había oído decir a Delgado y a Márquez; y (2) la declaración de José María Cruz respecto a la confesión que hicieran Delgado y Márquez el mismo día 16 de agosto al efecto de que Ana Adelina Cruz era una boba porque ellos se habían burlado de ella. La declaración del padre de la perjudicada con respecto a la supuesta confesión de los acusados, de ser creída por el jurado, sería suficiente para conectar al apelante con la comisión del delito. Pero como también la corte, con la oposición de la defensa, admitió la declaración de la madre de la perjudicada referente a las manifestaciones de su hija el 16 de agosto, si esta parte de la declaración de la madre de la perjudicada no es admisible, no podría entonces determinarse si al traer el jurado un veredicto de culpabilidad lo hizo por haber dado crédito a la declaración del padre de la perjudicada sobre las confesiones de los acusados o por haberlo dado a la declaración de la madre. Por consiguiente, se hace necesario determinar si era o no admisible la declaración de Altagracia Cruz con respecto a lo que le dijera su hija el 16 de agosto.

---

juicio, suficientes para corroborar el testimonio de la ofendida en cuanto al ataque criminal de que fué víctima.''

La declaración de la madre, independientemente del relato hecho por la niña, se limitó a que el día del suceso vió al acusado asomado a la ventana de su habitación—contigua al apartamiento de la perjudicada—mientras la testigo se encontraba en el patio a donde había ido en lo que su hija se bañaba; que cuando regresó a la casa encontró a la niña sentada en un rincón, leyendo y mirando unos cuadros, y que el 6 de julio mojó una ropa de la niña y la encontró manchada de sangre. La declaración del médico se contrajo a que al examinar a la niña el día 8 de julio encontró que había sido desflorada y que el himen estaba aún en proceso de cicatrización.

El párrafo en cuestión, que además de ser erróneo era innecesario para la resolución del caso, debe entenderse eliminado, toda vez que la declaración de la madre, independientemente de la manifestación que le hiciera la hija, y la del médico, no tienden a conectar al acusado con la comisión del delito.

La espontaneidad en las manifestaciones por parte de la víctima es un elemento esencial para que la declaración sea admisible en evidencia. Por regla general, las manifestaciones de la víctima obtenidas a preguntas de la persona que las recibe y declara sobre ellas no son consideradas como manifestaciones espontáneas, y consecuentemente no se admiten en evidencia; pero la regla no es inflexible, y en ciertos casos, cuando la apariencia de los vestidos o de la persona de la víctima inducen a interrogarla y meramente se le pregunta lo que le sucede y en contestación emite su queja o manifestación, y en casos de niños de corta edad o de adultos mentalmente retardados, tales manifestaciones así obtenidas sin coacción alguna son admisibles, si bien el hecho de que la manifestación haya sido hecha en contestación a una pregunta es cuestión a considerar a los efectos del peso de la prueba. Si determinada manifestación o declaración es admisible depende necesariamente de los hechos peculiares de cada caso. *Pueblo* v. *Fuentes,* supra; *State* v. *Ellison* (N. M. 1914), 144 Pac. 10; *State* v. *Dudley* (Iowa 1910), 126 N. W. 812; *Lewis* v. *State* (Miss. 1938), 184 So. 53; *Conger* v. *State* (Tex. 1911), 140 S. W. 1112; *Williams* v. *State* (Tex. 1943), 170 S. W. (2d) 482. Tampoco es inflexible la regla en cuanto a la fecha más o menos próxima en que se hiciere la manifestación, dependiendo en todo caso de si las circunstancias concurrentes impidieron hacerlas en fecha anterior. *Pueblo* v. *Blancó,* supra.

En el presente caso, como hemos visto, inmediatamente después de llegar la perjudicada a su casa el día de autos, al notar la madre que caminaba con dificultad y tenía el traje roto y manchado de sangre, preguntó a su hija lo que le había sucedido, contestando ésta entonces que las manchas de sangre procedían de su menstruación y que caminaba con dificultad porque tenía los pies cansados. En esta oportunidad pudo la **perjudicada manifestar** a su madre lo que le había sucedido, y esas manifestaciones hubieran sido admi-

sibles en evidencia. Pero. pasaron ocho días y la perjudicada nada dijo a sus padres, hasta que investigada nuevamente por la madre con motivo de lo que en el camino oyó el padre decir a los acusados, relató una historia completamente distinta de la anterior, incriminando en esta última ocasión a los acusados. A nuestro juicio estas segundas manifestaciones de la perjudicada no son las manifestaciones espontáneas a que se refiere la doctrina anteriormente expuesta. Es verdad que según ella declaró, los acusados la habían amenazado con matarla, pero no aparece de la prueba que ella continuara después de realizado el delito bajo la influencia dominadora de ellos. No revelan los autos que ella volviera a verlos en alguna ocasión, y por el contrario se hallaba entre sus padres, de quienes nada tenía que temer.

No son éstas las circunstancias que concurrieron en el caso de *Pueblo* v. *Fuentes,* supra. · Allí se trataba de una niña de trece años y medio, que al ser violada fué amenazada por el acusado para que no gritara, diciéndole que tenía un puñal, y que sería peor para ella si le decía algo a sus padres. Aún después del suceso ella volvió a ver al acusado de lejos y él le hacía señas para que se callara, de ese modo manteniéndola bajo la amenaza original. No obstante tales amenazas, seis días después de realizado el delito, al encontrar la madre la ropa de la niña manchada de sangre, le preguntó lo que le había sucedido, y ella entonces le contó.

También es distinto el presente caso del de *Pueblo* v. *Blanco,* supra. En dicho caso se trataba de una niña de tierna edad que vivía con una tía y el esposo de ésta, el acusado, en la ciudad de San Juan. La niña fué violada por el esposo de su tía, y ella lo comunicó a ésta, quien la amenazó con matarla si decía a alguien lo que le había sucedido. Así transcurrió un año o más, durante el cual el acusado violó distintas veces a la niña, quien permanecía inducida al silencio por amenazas de violencia física. La madre y la hermana residían en Ponce. La niña no podía escribir

ni tenía de quien valerse para comunicarse con su mamá y su hermana. Pero al cabo del año de haberse cometido el delito, su hermana vino a San Juan, e inmediatamente al encontrarse con ella, la perjudicada espontáneamente le relató lo que le había sucedido con el acusado: En el acto del juicio la declaración de la hermana con respecto a las manifestaciones que le hiciera la perjudicada fueron admitidas con oposición de la defensa, y este tribunal confirmó la sentencia porque no obstante el tiempo transcurrido entre la comisión del delito y la comunicación a la hermana, la perjudicada había hecho una manifestación dentro del tiempo más próximo que pudo consideradas las circunstancias.

En el presente caso, no habiendo hecho la perjudicada las manifestaciones que incriminaban a los acusados, espontáneamente en la primera oportunidad que tuvo para ello, tales manifestaciones no caen dentro de la excepción a la regla de la prueba. de referencia y por consiguiente no son admisibles en evidencia. Habiendo sido juzgado el acusado· por un jurado, debemos presumir que esa importante evidencia· le perjudicó, pues es imposible determinar si al declararlo convicto el jurado basó su veredicto, en todo o en parte, en la evidencia inadmisible. *Pueblo* v. *Feliciano,* supra. *Cf. The United States* v. *King et al.,* 48 U. S. 832; *Sinclair* v. *United States,* .279 U. S. 749; *Swepston* v. *United States,* 251 Fed. 205; *Biggs* v. *State* .(Tex. 1929·), 23 S. W. (2d) 729; *Birmingham* v. *State* (Wis. 1938), 279 N. W. 15, 116 A.L.R. 554, y *People* v. *Jorezak* (Ill. 1937), 9 N. E. (2d) ·227.

Siendo perjudicial el error cometido por la corte al admitir con la oposición del acusado prueba inadmisible, el veredicto es contrario a la ley, y *procede revocar la sentencia apelada y devolver el caso a la corte inferior para un nuevo juicio.*