El Pueblo de Puerto Rico, demandante y apelado, *v.*
Arturo del Valle Milán, acusado y apelante.

Núm. 7269.—*Sometido:* Diciembre 15, 1938. *Resuelto:* Enero 10, 1939.

*Leopoldo Tormes García,* abogado del apelante; *R. A. Gómez, Fiscal,*
y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Asociado Señor De Jesús emitió la opinión del
tribunal.

Arturo del Valle Milán fué convicto de un delito de
alteración de la paz y sentenciado por la Corte de Distrito de

Guayama a pagar una multa de $15 y las costas, o en su defecto a cumplir un día de cárcel por cada dólar de multa que dejare de pagar.

En el recurso de apelación que interpuso para ante este tribunal, imputa a la corte inferior la comisión de los siguientes errores:

"1. La Corte cometió error grave y perjudicial para el acusado en la apreciación y peso de la prueba presentada por el Pueblo.

"2. La Corte cometió error al declarar que existía conflicto entre la prueba presentada por el Fiscal y por el acusado, cuando en realidad tal conflicto o contradicción no existe y por el contrario la prueba del acusado sólo tendió a aclarar hechos declarados por los testigos del Pueblo.

"3. La Corte cometió error grave y perjudicial para el acusado al admitir que los testigos del Pueblo declararon sobre hechos que podían cosstituir una forma distinta del delito de alterar la paz pública y que no estaban alegados en la denuncia.

"4. La sentencia en este caso es contraria a las pruebas y a la ley."

Los señalamientos de error 1, 2 y 4 se contraen a la apreciación de la prueba. Los discutiremos conjuntamente.

De la prueba resulta que el día de autos el apelante, que entonces era inspector de sanidad, ocupó cierta leche que se vendía clandestinamente en la ciudad de Guayama. Juró las correspondientes denuncias y puso la leche a disposición del juez municipal. Después de radicadas las denuncias fué el acusado donde el juez municipal para que le permitiese agregar en las denuncias el nombre de un testigo de cargo y la entrevista que tuvo con dicho funcionario fué muy cordial, a la vez que respetuosa por parte del acusado para con el juez. Previa autorización de éste el acusado agregó a las denuncias el nombre del testigo que había omitido y se retiró. Poco tiempo después una persona interesada en la leche ocupada por el acusado solicitó del juez que se la devolviese, no accediendo éste, porque según él, los reglamentos de Sanidad prescriben que la leche así ocupada debe ser destruída. Le informaron entonces que la Sanidad aseguraba que el

devolver la leche era discrecional en el juez. Esto lo incomodó, y, dirigiéndose a un grupo en el cual se hallaba el acusado, preguntó quién había dicho que él podía devolver la leche, y como nadie le contestara, preguntó directamente al acusado si era él quien lo había dicho. El acusado contestó negativamente, y entonces el juez, en presencia del grupo, se expresó en los siguientes términos:

". . . yo no permito a ningún inspector de Sanidad ni ninguna persona que interfiera en mis funciones de Juez Municipal, mientras yo sea el Juez Municipal de esta Corte, todas las ejecutorias que haya aquí que ordenarse y hacerse cumplir, las haré como Juez Municipal porque yo no voy a permitir como Juez Municipal que un inspector de Sanidad me enseñe a mí lo que aprendí en la Universidad de Puerto Rico . . ." (Récord, pág. 17.)

Estas manifestaciones del juez violentaron al acusado, lo hicieron enrojecer, según él, pero no tuvieron resultado alguno, retirándose el juez a su oficina. Tres o cuatro minutos después volvió el juez a la oficina del Secretario y pidió los autos de los casos en cuestión, con el fin de ordenar la destrucción de la leche. En esos momentos el secretario le informó que el acusado había manifestado en presencia de unas muchachas que allí se hallaban que si el juez se atrevía a devolver la leche le formularía cargos ante el Procurador General. Al oír esto el juez salió a la calle sin chaqueta, y al ver al acusado parado junto a una motocicleta, como a veinte pasos de la corte, lo llamó, y al llegar éste a la oficina del secretario, en presencia de este último, del márshal y de unas niñas, se desarrolló la escena que el juez describe así:

". . . llegó el Sr. del Valle, le dije, 'Ud. oyó, me oyó resolver este caso en sentido adverso a la petición de estos señores, después de haberse resuelto definitivamente esto, Ud. dijo aquí que si yo devolvía la leche me formularía cargos, ¿para qué Ud. hace eso?', entonces él en forma violenta se retiró atrás, 'lo digo y lo sostengo, no me venga abriendo la boca, aquí Ud. está acostumbrado a abrile la boca a todo el mundo en Guayama, pero a mí no me la abre, porque no soy de Guayama.' Dije, 'hágame el favor de salir de aquí, Ud. es

un atrevido'; dijo, 'no salgo nada, estoy radicando unas denuncias;' dije, 'Ud. la radicó ya hace tiempo', dice él, 'no me voy, sáqueme si puede.' Caminó dos pasos atrás, llevó la mano violentamente hacia el sitio donde llevaba el revólver y a medias sacó un revólver, todo ello gesticulando, violentamente dijo: 'Usted lo que pasa es que es un chango, voy a partirle la cara.' Le dije, 'hágame el favor de salir de aquí, aquí yo soy el Juez.' Dijo, él, 'sálgase a la calle, que le voy a partir la cara'; digo, 'llámenme un policía.' Yo estaba desarmado, pero adentro está detrás de mí el Márshal de la Corte, que cuando vió el gesto de él sacando el revólver, cuando el Márshal vió que llevó la mano a la baqueta, el Márshal llevó su mano también a su baqueta, entonces dijo él: 'No saque ese revólver.' El Márshal dijo, 'no lo voy a sacar, pero guarde el suyo porque Ud. está en la corte.' Metió el revólver en el bolsillo, el Márshal no tuvo que sacar el de él, y le dijo: '¿Se va a ir o se va a quedar?'

''. . . . . . . .

"Mientras le decía yo, 'hágame el favor, váyase de aquí, ¿se va a quedar en la corte?,' empezó a caminar de espaldas, dándome el frente, diciendo, 'Ud. es un chango, le voy a partir la cara, échese para la calle que le voy a partir la cara.' En eso llegó el policía Colón en la puerta, se paró, digo: 'Sáqueme este hombre de aquí'; y nuevamente caminó hasta salir, en la puerta diciendo, 'Véngase afuera, aquí estamos de igual a igual, no estamos en la corte', y 'policía, sáqueme ese hombre de aquí.' Dijo: 'Móntese en ese carro y vámonos a la carretera,' todo en forma violenta, alta voz, se habían aglomerado en la calle como alrededor de 18 ó 20 personas. Digo: 'Ahora mismo voy a radicar una denuncia contra Ud. y lo voy a mandar a arrestar inmediatamente.' Sacó carrera, no fué carrera, no corrió, caminó ligero hacia la esquina y se fué.''

No abrigamos la menor duda de que el carácter impulsivo del juez fué lo que provocó el incidente desagradable. El hecho de que el acusado no opinase como él sobre su facultad para devolver la leche no era motivo para que se violentase y le dijese lo que transcribimos antes. El propio juez declaró que al hacer tales manifestaciones "el acusado se puso violento en su gesto, la faz, se puso nervioso. . .", etc. Pero esta provocación por parte del juez no exime de responsabilidad al acusado. No se trata de una alteración de la paz por riña, en que por ser de aplicación la doctrina de defensa propia, no incurre en delito aquél que al ser ata-

cado por otro no usa más fuerza de la necesaria para repeler la agresión, aunque con motivo de la riña se altere la paz pública. *Pueblo* v. *Torres,* 18 D.P.R. 933, y *Pueblo* v. *Franquis,* 24 D.P.R. 615.

Cuando se trata de una alteración de la paz por medio de provocaciones, improperios, desafíos, etc., la persona a quien éstos van dirigidos no tiene derecho a contestar con otros insultos o improperios; todo lo que puede hacer es denunciar el caso ante los tribunales y no incurrir él en la misma falta. A este efecto dice Corpus Juris:

"No constituye una buena defensa que las palabras insultantes que tendieron a alterar la paz sean ciertas; que la esposa del acusado falsamente le informase que el denunciante la había insultado; *que el denunciante hubiese dado motivo al lenguaje grosero del acusado por haberlo él provocado antes; o que el denunciante haya incurrido en el mismo delito que el acusado."* 9 C. J. 389, y casos citados.

De manera, pues, que la conducta anterior del juez no justificó al acusado para alterar la paz de aquél, del Secretario y de las niñas aludidas. Asumiendo que el juez también hubiese alterado la paz, el derecho del apelante era denunciarlo.

■■ Consideremos ahora el tercer señalamiento de error. Dice así:

"La Corte cometió error grave y perjudicial para el acusado al admitir que los testigos del Pueblo declararan sobre hechos que podían constituir una forma distinta del delito de alterar la paz pública y que no estaban alegados en la denuncia."

Una de las modalidades del delito de alterar la paz, según lo define el artículo 368 del Código Penal, la constituyen los "desafíos o provocaciones." En este caso el acusado no solamente usó un lenguaje ofensivo al juez, si que también lo desafió a pelear, lo invitó que bajase a la calle, y hasta hizo ademán de sacar un revólver. La prueba sobre el desafío y amenazas era claramente admisible, pues no sólo se alegó en la denuncia, no pudiendo por consiguiente alegar sorpresa

el acusado, si que también la jurisprudencia declara que las distintas modalidades expresadas en el estatuto constituyen un solo delito—el de alterar la paz. 9 C. J. 389, y casos citados.

No cometió el juez inferior error alguno al admitir la prueba de las alegadas provocaciones y desafíos, y al basar su sentencia en esta modalidad del delito no lesionó ningún derecho del acusado.

*Procede, por lo expuesto, confirmar la sentencia apelada.*

El Juez Presidente Sr. Del Toro no intervino.