518

EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* FELICIANO ADORNO, c/p CHIQUITÍN, acusado y apelante.

Número 15779.

*Reasignado:* 13 de febrero de 1959. *Resuelto:* 10 de septiembre de 1959.

*Romany & Romany,* abogados del apelante; *Hon. Secretario de Justicia Hiram R. Cancio (José Trías Monge, Ex-Secretario de Justicia,* en el alegato) y *Rafael L. Ydrach Yordán, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante Feliciano Adorno fué acusado conjuntamente con José M. Padilla y Francisco Casalduc de un delito de soborno cometido, según la acusación, de la manera siguiente: "Los referidos acusados, José M. Padilla, Francisco Casalduc y Feliciano Adorno, c/p Chiquitín, allá en o por el año 1952 y dentro del Distrito Judicial del Tribunal Superior de Puerto Rico, siendo funcionarios ejecutivos del Gobierno Insular los dos primeros, (José M. Padilla y Francisco Casalduc), como cabos de la Policía de Puerto Rico en sus funciones de detectives, y siendo bolitero el tercero, (Feliciano Adorno, c/p Chiquitín), quien en forma ilegal, voluntaria, maliciosa y corruptamente ofreció y dió dinero a los otros dos acusados (José M. Padilla y Francisco Casalduc) con el propósito de influir en las actuaciones de ellos en su carácter oficial, en la inteligencia y con el entendido entre los tres acusados de que por medio de dicho soborno los dos acusados José M. Padilla y Francisco Casalduc no perseguirían según su obligación las infracciones a la Ley Núm. 220 de 1948, conocida por la Ley de la Bolita, cometidas por el acusado Feliciano Adorno, c/p Chiquitín o sus agentes en la operación de una banca clandestina de Bolita."

Como consecuencia de nuestras resoluciones en dos recursos traídos ante este Tribunal(1) el Fiscal sirvió al apelante y a los otros coacusados un pliego especificando los siguientes particulares: "1—Que los hechos imputados en esta acusación se contraen a distintos actos ocurridos en ocasiones distintas; habiéndose hecho la propuesta de soborno de los acusados José M. Padilla y Feliciano Adorno, c/p Chiquitín, al acusado Francisco Casalduc en un domingo en el mes de abril de 1952 en las inmediaciones de la casa del acusado Francisco Casalduc en Arecibo por conducto del detec-

---

(1) *Ortiz* v. *Tribl. Superior y Pueblo, Int.*, 75 D.P.R. 58; *Castro et al.* v. *Tribl. Superior, Certiorari* núm. 2016, resuelto en 25 de junio de 1953.

tive José Luciano, quien, a fines de abril o principios de mayo de 1952 entregó al acusado Casalduc de parte de los acusados José M. Padilla y Feliciano Adorno, c/p Chiquitín, la suma de $50.00 en la Clínica del Buen Pastor en Arecibo como parte del soborno y al entregarle dicha suma al acusado Francisco Casalduc fué informado de que pasara los días 15 de cada mes por la casa de Padilla a buscar los $100.00 de parte de Chiquitín, según la propuesta original. 2.—Que el acusado Feliciano Adorno, c/p Chiquitín entregó al co-acusado José M. Padilla como Soborno la suma de $600.00 en la casa número DO-10 de Puerto Nuevo donde se reunieron dos o tres días después del día 24 de diciembre de 1952 y durante la conversación que tuvieron los co-acusados Feliciano Adorno, c/p Chiquitín y José M. Padilla, Adorno le dijo a Padilla que ya él, Padilla, había cogido los $600.00 del día 15, refiriéndose al 15 de diciembre de 1952. 3.—Que el Fiscal no tiene información de los días específicos en que ocurrieron los hechos que se imputan en la acusación, sino en la forma arriba indicada."

Los acusados Padilla y Casalduc excepcionaron por escrito la acusación alegando que en la misma se imputaba la comisión de más de un delito sin exponerse en cargos separados. Esta moción fué declarada sin lugar. El otro acusado Adorno solicitó juicio por separado y le fué concedido pero luego, a solicitud del Fiscal el tribunal reconsideró su resolución y ordenó que los tres acusados fueran juzgados conjuntamente.

Al comenzar el juicio y antes de desinsacularse el jurado, el acusado Adorno solicitó que el Fiscal eligiera el cargo por el cual iba a sostener su acusación contra dicho acusado, esto es, si por los hechos ocurridos en Arecibo o por los ocurridos en Puerto Nuevo según se especificaban en el pliego de particulares. El tribunal también declaró sin lugar esta moción.

Después de constituirse un jurado y de seguirse los demás trámites de ley, el Fiscal procedió a presentar la prueba de

cargo contra los tres acusados. Una vez evacuada dicha prueba los acusados solicitaron del tribunal que ordenara al jurado rendir un veredicto absolviéndolos del delito que se les imputaba. El tribunal así lo ordenó en cuanto al acusado Francisco Casalduc y denegó la solicitud en cuanto a los otros dos coacusados. En su consecuencia, el jurado rindió un veredicto directo declarando a Casalduc no culpable, luego de lo cual prosiguió el juicio practicándose la prueba de defensa ofrecida por el acusado Padilla. Sometido el caso finalmente al jurado, este rindió un veredicto declarando no culpable a José M. Padilla y rindió otro veredicto declarando a Feliciano Adorno, c/p Chiquitín, culpable del delito de soborno. Más tarde el tribunal dictó sentencia condenando a Adorno a sufrir una pena de 5 a 10 años de presidio.

Contra dicha sentencia interpuso el acusado Adorno el presente recurso de apelación señalando la comisión de los siguientes errores:

### Primer Error

"La corte inferior cometió un craso error al no conceder un juicio por separado en este caso cuando de la propia acusación y del pliego de particulares aparecía claramente que se imputaban un sin número de delitos distintos a los acusados, y el fiscal sabía de antemano que iba a presentar prueba que incriminaba a los acusados José M. Padilla y Francisco Casalduc, pero que no incriminaba en absoluto al acusado apelante en este caso."

### Segundo Error

"La Corte inferior cometió error al declarar sin lugar la moción para desestimar la acusación presentada en este caso puesto que ella adolecía del defecto de duplicidad de delitos contra distintos acusados que indebidamente se habían incluído en la misma acusación, en un solo cargo (count) en violación del artículo 77 del Código de Enjuiciamiento Criminal."

### Tercer Error

"La corte inferior cometió un craso error en este caso al no ordenar al Fiscal que eligiera, en cuanto al acusado Feliciano Adorno concernía, en cuál de los distintos delitos imputados en

la acusación y en el Bill de Particulares iba a sostener su acusación al jurado contra Feliciano Adorno."

### Cuarto Error

"La corte inferior cometió error en este caso al permitir con la oposición y excepción del apelante que el detective José Luciano declarara ante el jurado que Casalduc le dijo al testigo Luciano que 'el Fiscal de Arecibo tenía interés en este caso contra Chiquitín'."

### Quinto Error

"La corte inferior cometió error al no declarar con lugar la solicitud nuestra que se exigiese al Fiscal que dijese claramente cuál era el propósito para el cual intentaba probar distintos actos de soborno cometidos con el acusado Padilla por terceras personas independientes no incluídas en la acusación y dueños de empresas en las cuales Adorno no tenía participación alguna y en cuyas transacciones Adorno no había intervenido."

### Sexto Error

"La corte inferior cometió error al permitir evidencia en este caso sobre alegados sobornos, entre otros el imputado a Carlos Cáceres dueño o administrador de un prostíbulo, Carolina Summer Resort, con el acusado José M. Padilla y en los cuales solamente intervino el detective José Luciano y el acusado Padilla, pero que en ellos ni Adorno ni Casalduc tuvieron intervención alguna."

### Séptimo Error

"Igualmente la corte inferior cometió error al permitir, que con la oposición y excepción de los acusados, que el testigo Luciano declarara sobre otros alegados sobornos supuestamente cometidos por los dueños del Hotel Mallorca, Hotel Carioca, con Nun, dueño de una banca clandestina en el hipódromo y con el dueño de El Bosque, y con Perfecto Segarra, y en los cuales el acusado apelante Feliciano Adorno no intervino, ni tenía interés económico en dichos establecimientos y era un hecho admitido y no discutido que Adorno nada tenía que ver con esas transacciones."

### Octavo Error

"La corte inferior cometió error al no permitir a la defensa ni al testigo José Luciano contestar a repreguntas nuestras sobre lo que el Coronel Roig le dijo al testigo en la conferencia

privada que tuvieron en la oficina del Coronel Roig al día siguiente de haber sido testigo Luciano sorprendido infraganti recibiendo dinero de Cáceres."

### Noveno Error

"Igualmente cometió error la corte inferior al coartar indebidamente el examen de repreguntas al testigo José Luciano al no permitir que dicho testigo dijera lo hablado en la conferencia con el Capitán Camacho al día siguiente de haber sido sorprendido aceptando un soborno de Cáceres."

### Décimo Error

"La corte inferior cometió error al permitir al testigo Víctor Barrios Cano declarar que allá por el año 1938 o 1939 jugaba dados, poker y monte con Feliciano Adorno."

### Undécimo Error

"La corte inferior cometió error al no permitir al testigo Víctor Barrios Cano que contestase la pregunta hecha por el suscribiente sobre si había hablado con alguna persona antes de declarar en este caso."

### Duodécimo Error

"La corte inferior cometió error al permitir al testigo Perfecto Segarra Pérez que declarase sobre que allá por el año 1946 trabajaba con el acusado Feliciano Adorno en una banca de bolita, por ser una fecha muy remota a los hechos alegados en la acusación."

### Décimo Tercer Error

"La corte inferior cometió error al declarar sin lugar la moción presentada por el acusado apelante para que la corte ordenase al jurado que trajese un veredicto de no culpable a favor del acusado Feliciano Adorno."

### Décimo Cuarto Error

"La corte inferior cometió error en este caso al instruir al jurado que el testigo, el detective José Luciano Rivera no era un cómplice de Feliciano Adorno."

### Décimo Quinto Error

"La corte inferior cometió error al denegar la instrucción solicitada por el apelante de que se instruyese al jurado como cuestión de derecho que el testigo, detective José Luciano Rivera era cómplice de Feliciano Adorno y que por lo tanto su testi-

monio debía ser corroborado con otras pruebas que independientemente de la declaración de Luciano conectasen al acusado apelante con la comisión de los delitos de soborno alegados en la acusación."

### Décimo Sexto Error

"La corte inferior cometió error al declarar sin lugar la moción del acusado Feliciano Adorno de que se dejase sin efecto el veredicto de culpabilidad rendido contra Feliciano Adorno, por el fundamento de que dicho veredicto era en absoluto inconsistente con el veredicto absolutorio rendido por el mismo jurado y con la misma evidencia a favor del acusado José M. Padilla."

Antes de discutir estos errores precisa hacer un resumen de la prueba que sirvió de base a la convicción del apelante. La testifical, que le conecta con la comisión del delito imputádole, consistió en el testimonio del detective José Luciano Rivera y en el de los de Víctor Barrios Cano, Perfecto Segarra Pérez y María Isabel de Jesús. Dicho resumen, según fuera trasmitido por el juez sentenciador al jurado es como sigue:

"Para probar su teoría, el Fiscal presentó como primer testigo, a José Luciano Rivera. Este testigo declaró en esencia lo siguiente:

"Que tiene 36 años, que vive en Santurce, que antes de residir en Santurce residía en DO-10, Puerto Nuevo; que es detective de la policía insular desde el año 1940; que ingresó como guardia de segunda clase cuando por primera vez ingresó en la policía. Que entró al ejército en el año 1943 y estuvo en el ejército hasta el año 1946 cuando regresó a la detective. Que del 1946 hasta el 1948 ó 1949 estuvo en la Parada 19 como tal policía; en el 1949 fué adscrito al Departamento de Hacienda en la división que hay en ese departamento para la persecución de narcóticos. Que de 1950 a 1951 el testigo empezó a formar parte del escuadrón contra el vicio y fué adscrito a la zona metropolitana.

"Declaró que conoce a los tres acusados, que conoce a Padilla desde el año 1946 y a Casalduc lo conoce desde el 1947 al 1948. Que cuando el testigo empezó en el escuadrón lo dirigía el señor Costa; que después de Costa lo dirigió Pérez; y después de

Pérez el acusado Padilla lo dirigió interinamente. Que cuando Padilla lo dirigía en el escuadrón estaban Vázquez, el detective Vázquez, el detective Padilla, el detective Díaz, el detective Ramos, el detective Aldamuy, el detective Rivera, el detective Santo Domingo, y él, Luciano, que estaba declarando. Dice el testigo que empezó a pertenecer al escuadrón del vicio desde que reorganizaron dicho escuadrón. Declaró que Casalduc era cabo de la detective en Arecibo. Que Feliciano Adorno se conoce por el nombre de Chiquitín. Declaró que Chiquitín se dedica a banquero de bolita, y que funcionaba la banca desde Bayamón hasta Arecibo. Declaró que recuerda haber visto a Casalduc en el mes de abril de 1952. Declaró que él salió con Padilla hacia Arecibo en un domingo de abril de 1952 desde la casa de Padilla en Villa Caparra; que entonces, para esa época, el testigo vivía en DO-10, Puerto Nuevo. Declaró que Padilla, el acusado, fué a casa del testigo y que de allí fueron a casa de Padilla, y de casa de Padilla salieron para Arecibo, pasaron por Manatí donde se quedó la señora de Padilla y otros acompañantes que iban en el automóvil, entre ellos la señora de Padilla, dos nenas y un matrimonio americano de nombre Richard él, el marido se llamaba Richard de ese matrimonio americano. Que en el camino de Manatí a Arecibo Padilla y el testigo hablaron; que Padilla le dijo al testigo que ellos iban a hablar con Casalduc para ofrecerle $100 a nombre de Chiquitín, a cambio de que Casalduc no persiguiera a Chiquitín en Arecibo en el juego de la bolita. Que el testigo le dijo al cabo Padilla en esa oportunidad, caminando de Manatí a Arecibo, que si eso no era peligroso. Que al llegar a Arecibo, en la intersección de la carretera que de Arecibo conduce a Utuado, pasaron allí frente a un bar y que preguntaron donde era que vivía el policía Casalduc. Que allí se quedó Padilla y el testigo, Luciano, se fué hasta llegar a la casa de Casalduc. Que entonces el testigo llamó en casa de Casalduc y Casalduc salió y frente a la casa de Casalduc hablaron. Que el testigo le dijo a Casalduc que Chiquitín le mandaba a ofrecer $100 mensuales para que no le persiguiera la bolita. Que entonces Casalduc le dijo que tenía que pensarlo porque el Fiscal de Arecibo tenía interés en perseguir a Chiquitín. Así las cosas el testigo se vino y se reunió con Padilla otra vez donde había dejado a Padilla allí frente al bar ese en la intersección de la carretera que de Arecibo conduce a Utuado, y le informó a Padilla sobre la conversación que había habido con Casalduc. Que

vinieron para San Juan y el testigo se quedó en Puerto Nuevo y Padilla se fué para casa de Padilla.

"Dice el testigo que él volvió a Arecibo con Padilla para principios de mayo, para llevarle $50 a Casalduc, en relación estos $50 con lo que el testigo había hablado con Casalduc en aquel domingo de abril. Llegaron otra vez ese día a la carretera que conduce de Arecibo a Utuado; que Padilla entonces se quedó en el bar, que el testigo fué a casa de Casalduc; que cuando fué a casa de Casalduc una dama salió y le explicó que Casalduc no estaba allí, que Casalduc estaba recluído en la Clínica del Buen Pastor en Arecibo. Entonces Luciano volvió de la casa de Casalduc a donde estaba Padilla en el bar que estaba allí cerca de la intersección; entonces Padilla y el testigo fueron hacia la Clínica del Buen Pastor para llevarle los $50 a Casalduc; que Padilla se quedó por acá, cerca de la clínica, y el testigo llamó en la clínica y tocó en una puerta que era de cristal; que al tocar en esa puerta de cristal por la ventana que está en esa dirección pero en el segundo piso salió una enfermera de la clínica; que era una enfermera que tenía un traje azul y un gorro; que entonces el testigo le dijo a la enfermera que quería ver a Casalduc; entonces la enfermera se entró y al cabo del rato salió Casalduc por la puerta principal donde él había tocado; que Casalduc allí recibió los $50 y el testigo le dijo, después de haberle dado los $50, que viniera todos los días 15 a buscar los $100 que le remitiría Chiquitín mensualmente.

"Que de allí el testigo y Padilla salieron para San Juan; declaró que ninguno de los dos firmó el registro que hay en los cuarteles cuando un policía entra habiendo ido a otro distrito; no fueron al cuartel ni se dieron entrada ni salida a ese distrito.

"Declaró que Feliciano Adorno vive en Santa Teresita cerca de la urbanización que está cerca de la calle Loíza. Declaró que en diciembre de 1952 él vió a Feliciano Adorno, y que lo vió dos o tres días después del día 24 de dicho mes y año. Que Padilla le había dicho al testigo que fuera a hablar con Feliciano Adorno para que le dijera a Feliciano Adorno que fuera a ver a Padilla para que Feliciano Adorno le diera el aguinaldo a Padilla. Que el cabo Padilla fué ese día como a las 6:30 de la tarde, a casa del testigo, y el testigo en ese día le dió el recado a Chiquitín; que Chiquitín fué a casa del testigo como a eso de las 7:30 o 7:45 de la noche y allí se reunieron Chiquitín y Padilla; que cuando ellos estaban así reunidos, el testigo se fué para el baño y al

rato de estar en el baño salió el testigo y se sentó en la sala donde estaban Chiquitín y Padilla; que Chiquitín le decía en esos momentos a Padilla, que una banca de Dorado le estaba haciendo daño; que Padilla le contestó que ya ésa la habían cogido; que Chiquitín entonces le ofreció unos datos sobre la banca de Dorado; que entonces Padilla le pidió un mes adicional de aguinaldo a Chiquitín; que Chiquitín le ofreció $500 pero que Padilla le pidió $600 y entonces Chiquitín se los dió; que se los dió en billetes de $100 y de $50, y que le dijo 'tú eres el que más pides'. Que entonces Chiquitín se fué y Padilla se quedó con el testigo; que Padilla le ofreció un regalo al testigo. Que Padilla se fué de casa del testigo."

" . . . . . . . .

"El segundo testigo que declaró fué Víctor Barrios Cano. Este testigo declaró que tiene 35 años de edad y vive en el Barrio Obrero; que antes de dedicarse al negocio de cerdos que ahora tiene montado, se dedicaba a un negocio de juego prohibido. Que desde el año 1947 al 1950 se dedicó a explotar una banca de bolita en la zona metropolitana y por estos pueblos de alrededor; que empezó la banca con la cantidad de $27,000 que se había ganado en un premio de la lotería de Puerto Rico. Declaró que conoce al acusado Padilla, que conoce a Feliciano Adorno; que conoce a Feliciano Adorno hace alrededor de 15 años; que él, el testigo, habló con Adorno entre los meses de octubre a diciembre del año 1952; que habló sobre la bolita y las conexiones que Feliciano Adorno tenía con la policía; que en una de esas conversaciones Feliciano Adorno le pidió al testigo que averiguara quien era el Rubio para Feliciano Adorno eliminarlo de la bolita en 24 horas. Dice este testigo que Feliciano Adorno le dijo a él que le daba a Padilla $500 mensuales para que no le persiguiera; y le dijo Feliciano Adorno al testigo, que él, Feliciano Adorno, tenía controlada a la policía desde Cataño hasta Arecibo, y que entre ellos tenía controlado al jefe del escuadrón contra el vicio, al detective jefe del escuadrón contra el vicio en Arecibo. Que volvió a ver a Chiquitín después de esa oportunidad y que volvió a hablarle sobre la bolita y que volvió a hablarle sobre el Rubio; que él le dijo a Feliciano Adorno, cuando Feliciano Adorno le pidió que le averiguara quién era el Rubio, que el testigo, cuando tenía el negocio de la bolita, daba dinero pero que no daba confidencias. Que vió a Padilla alrededor de la Parada 22 entre los meses de noviembre

y diciembre cuando Padilla una noche entró al Club 22, que Chiquitín, con quién él estaba hablando, le dijo al testigo que lo dejaba porque tenía que hablar con Padilla. Que después que Chiquitín se fué, entró al Club 22 el testigo y vió a Padilla y a Chiquitín en dos mesas distintas pero cercana la una a la otra, cerca ellos dos; que cuando estaban así en esa posición, Chiquitín y Padilla hablaron.

"Declaró este testigo que él y Chiquitín fueron socios en el juego, que jugaban dados, póker y también jugaban monte. Declaró el testigo que conoce a Padilla desde el año 1948; que habló con Padilla en varias ocasiones durante los años de 1948 al 1950; que hubo ocasiones en que el testigo le dió dinero a Padilla; que de octubre a diciembre de 1952 él sabía que Feliciano se dedicaba al juego de la bolita. Que Chiquitín una vez le dijo al testigo que el producto de su negocio era como de diez a $12,000 semanales en colectas. Declaró el testigo que el testigo estuvo en la cárcel; que vive en el Barrio Obrero; que también vivió en Carpenter Road. Declaró que él tenía un negocio de juego en la Parada 22, y que lo tuvo cuatro meses; que ese negocio le dejaba más de $200 semanales; que ese negocio él lo eliminó para febrero de 1952; que no recuerda quien era el jefe del escuadrón; que el billete de la lotería premiado con $27,000 él se lo vendió a Chichí; que él sabe que Chiquitín es banquero por las conversaciones que con el mismo Chiquitín ha tenido. Declaró que al testigo le ocuparon en una oportunidad una caja de caudales con bolita y un revólver que pertenecía a un señor llamado Beltrán. Declaró este testigo que él le había declarado al Fiscal, y eso, en esencia, es lo que declaró el segundo testigo.

" . . . . . . .

"El otro testigo que declaró después de éste fué Perfecto Segarra Pérez. Declaró que vive en Río Piedras, se dedica actualmente a comerciante; que antes de ser comerciante tiraba bola con candungo; que empezó a tirar bola del año 1944 al 1945 y la estuvo tirando hasta el 1948; que el 1949 puso casa de juego en Río Piedras. Declaró que conoce al acusado José M. Padilla, que conoce a Pacheco, quien es detective; que conoce a Diego Ortiz, que es detective; que ha tenido relaciones con Padilla; que Padilla estuvo donde el testigo para que el testigo le diera $150 en el año 1948; que quedaron en que le daría $100 mensuales para Padilla, Diego Ortiz, Pacheco y otro

más a cambio de que no persiguieran al testigo en el juego de la bola. Que cuando tenía la casa de juego siguió dándole los $100; que mientras daba el dinero no lo persiguieron; que al principio lo entregaba personalmente pero después dejaba ese dinero con Bartolo Santiago quien para ese tiempo tenía casa de juego.

"Que el testigo conoce a Feliciano Adorno; que el testigo ha trabajado con Adorno en una banca de bolita de ayudante de sumar la colecta; que esto fué para el año 1946; que trabajó con Adorno como dos meses nada más; que el testigo ha estado preso unas cuantas veces; que pasan de tres o cuatro veces las que ha estado preso por acometimiento y agresión grave y por portar armas, entre otros. Que Padilla, Diego Ortiz y otros le cogieron por bolita. Que Padilla ha denunciado al testigo por juegos prohibidos varias veces; que Padilla y otros detectives le hicieron un rancho con bolita en Canóvanas; que con motivo de haberle cogido en Canóvanas el automóvil, el tribunal lo absolvió. Que el dinero se lo fueron a pedir al testigo en marzo o abril del 1948; que se lo pidieron en el Barrio Obrero. Que en el juicio que le llama él el juicio del rancho, actuó de juez el Juez Torres Aguiar y que los abogados defensores fueron Angel Díaz y Rafael V. Pérez Marchand. Que el testigo le pagó a Padilla seis o siete veces los $100 mensuales; que cuando Padilla pasaba en el jeep el testigo se le iba detrás y le entregaba en una calle los $100; que el testigo, que tenía una casa de juego, la quitó a fines de 1949; que no comprobó con Padilla si Bartolo le había entregado a Padilla los $100 que el testigo, en algunas oportunidades, le mandó con Bartolo Santiago. Dice él que el allanamiento que Padilla y otros detectives le hicieron fué en Canóvanas y que fué en el año 1950, y que eso fué un martes; que el testigo, en la celebración del juicio, no le dijo al Juez que él le pagara a Padilla porque Padilla no le persiguiera; que en el juicio declararon él y otro testigo, y contra él declararon detectives; que no hubo orden de allanamiento para registrarle el carro; que esa cosa fué levantada en el juicio.

"Dice que Adorno, para el año 1948, le pidió al testigo $1,500 prestados, los cuales Adorno le devolvió como dos meses después. Que en el 1950 Adorno le prestó al testigo $700; que Adorno le dijo a él en esa oportunidad en que le cogió los $700 que Adorno tenía un negocio de aceites y de bocinas de automó-

viles, y que el testigo le devolvió a Chiquitín como 15 días después, los $700; que él le había solicitado una cantidad mayor prestada a Chiquitín pero que Chiquitín le dijo que solamente tenía $700 encima, que se los prestaría con la condición de que se los devolviera 15 días después porque los necesitaba para levantar una mercancía que tenía almacenada."

"Después siguió declarando María Isabel de Jesús. Declaró que conoce a Feliciano Adorno; que el jueves 15 de enero de 1953 la testigo lo vió de seis y media a siete frente a la casa de la testigo; que Adorno le dijo a la testigo que deseaba ver a Luciano; que la testigo fué a ver a Luciano y después le dijo a Adorno que Luciano no deseaba verlo. Adorno le preguntó si ella le había dicho a Luciano quién era que deseaba verlo y ella le contestó que sí. Declaró esta testigo que se casó con Luciano el 22 de enero de 1953; que no recuerda cuando se divorció de su anterior esposo; que conoce a Luciano desde julio de 1951." (Quinta Pieza, pág. 1444 hasta la 1449; de la pág. 1454 a la pág. 1456; de la 1465 a la 1468.)

El fiscal presentó también prueba testifical y documental tendente a demostrar que el coacusado José Padilla recibió dinero por conducto de Luciano como soborno de varios prostíbulos, de los operadores de una banca clandestina en el hipódromo y de otro negocio ilícito donde se jugaban juegos prohibidos por la ley. En estas transacciones no intervino directa ni indirectamente el apelante Adorno y el juez sentenciador instruyó al jurado que no podían tomar en cuenta para nada dicha prueba en contra de Adorno.

██ El fiscal formuló una sola acusación contra los tres acusados alegando que habían actuado de común acuerdo entre sí y con un propósito común al cometer el delito de soborno.[2] A tenor con las disposiciones del art. 238 del Código de En-

---

[2] La imputación de dos o más delitos en la misma acusación o denuncia está autorizada por el art. 77 del Código de Enjuiciamiento Criminal (34 L.P.R.A., sec. 132), que dispone:

"Dos o más delitos pueden ser imputados en la misma acusación o denuncia, cada uno de ellos en un cargo separado, si dichos delitos son de igual o similar naturaleza, o han surgido del mismo acto o transacción o de dos o más actos o transacciones relacionadas entre sí o que constituyen partes de un plan común. Las alegaciones de un cargo pueden ser incorporadas por referencia en los demás."

juiciamiento Criminal (34 L.P.R.A., sec. 717) (³) fueron juzgados conjuntamente ante un jurado con el resultado que ya conocemos. Los acusados Padilla y Casalduc formularon oportunamente y en debida forma una excepción perentoria contra la acusación, fundada en que en la misma se les im-. putaba la comisión de más de un delito. A nuestro juicio el tribunal a quo resolvió correctamente al declarar sin lugar esta excepción perentoria. (⁴) Aunque Padilla y Casalduc no

(³) El art. 238 del Código de Enjuiciamiento Criminal, dispone:

"Cuando dos o más reos hayan sido acusados conjuntamente de cualquier delito público deberán ser juzgados conjuntamente a menos que el tribunal ordenare juicios por separado. Al ordenar juicios por separado el tribunal podrá discrecionalmente ordenar un juicio por separado para uno o más de los acusados, y un juicio conjunto para el resto de los acusados o podrá ordenar que cualquier número de los acusados sea juzgado en un solo juicio y cualquier otro número de los demás acusados en juicios distintos o podrá ordenar un juicio por separado para cada uno de los acusados." (34 L.P.R.A., sec. 717.)

(⁴) Padilla y Casalduc fueron acusados del delito de soborno definido en el art. 83 del Código Penal (33 L.P.R.A., sec. 273) que prescribe:

"Todo empleado, funcionario ejecutivo o administrativo del Gobierno Estadual o Municipal o de cualquier agencia, junta o corporación pública, ya sea ésta estadual o municipal, y toda persona elegida o nombrada para un cargo ejecutivo que pidiere, aceptare o conviniere en aceptar cualquier soborno, con el entendido o en la inteligencia de que tal soborno habrá de influir en su voto, opinión o determinación en cualquier asunto pendiente o sometido a su decisión, en su calidad de empleado, o funcionario ejecutivo o administrativo, incurrirá en pena de presidio por un término mínimo de un año y máximo de catorce años, perdiendo además su empleo y quedando por siempre inhabilitado para ejercer cualquier cargo público."

En la acusación se les imputó que " ... pidieron, convinieron en aceptar y aceptaron dinero del cuño legal de los Estados Unidos de América como soborno de parte del tercero (Feliciano Adorno, c/p Chiquitín) .... " La imputación en un solo cargo de que los acusados *pidieron, convinieron en aceptar y aceptaron* dinero como soborno no vicia la acusación por defecto de duplicidad. En ocasiones anteriores hemos adoptado la doctrina de que cuando al definir un delito el estatuto enumera una serie de actos, uno solo de los cuales separadamente o todos ellos juntos constituyen el delito, dos o más de dichos actos pueden imputarse en un solo cargo ya que todos constituyen un solo delito. En *Pueblo* v. *Vázquez,* 20 D.P.R. 361, se imputó al acusado que " ..... solicitó, pidió, recibió y convino en recibir un soborno de más de $100 ..... " Resolviendo el ataque por duplicidad a la acusación este tribunal dijo a la pág. 364: "Estamos conformes en que el delito puede cometerse bajo cualquiera de dichas formas: pidiendo, recibiendo o conviniendo en recibir, pero cuando todos a la vez concurren y se imputan a una persona como actos sucesivos de una sola transacción,

son partes en este recurso ya que ambos fueron absueltos del delito qué se les imputaba, nos hemos referido a la excepción perentoria presentada por ellos porque el aquí apelante señala como error la resolución declarándola sin lugar. Sin embargo, como el apelante no excepcionó la acusación en debida forma y en tiempo oportuno, él no puede suscitar esta cuestión en apelación. Arts. 152 y 154 del Código de Enjuiciamiento Criminal. *Pueblo* v. *Morales*, 14 D.P.R. 234; *Pueblo* v. *Echavarry*, 28 D.P.R. 6; *Pueblo* v. *Torres*, 48 D.P.R. 39. Pero esto no nos dispensa de considerar la acusación al examinar el error referente a la negativa del tribunal a quo a ordenar al Fiscal "que eligiera en cuanto al acusado Feliciano Adorno concernía, en cuál de los distintos delitos imputados en la acusación y en el Bill de Particulares iba a sostener su acusación al jurado contra Feliciano Adorno." Este señalamiento de error conlleva la determinación de si el acusado Adorno fué sometido a juicio bajo una acusación que le imputaba la comisión de dos delitos en un solo cargo, y si el

entonces constituyen como en este caso un solo delito público." Véanse además, *Pueblo* v. *Echavarry, et al*, 28 D.P.R. 6; *Pueblo* v. *Del Valle*, 54 D.P.R. 44; *Pueblo* v. *Labrador*, 57 D.P.R. 687; *Pueblo* v. *Palacios*, 66 D.P.R. 961; *People* v. *Gusti*, 113 Cal. 177; *People* v. *Eagan*, 116 Cal. 287; *People* v. *Ellenwood*, 119 Cal. 166; Fricke, *California Criminal Procedure* (3d ed. 1952), págs. 99 y 100. Sustancialmente el art. 77 de nuestro Código de Enjuiciamiento Criminal es igual a la Regla 8(a) de las de Procedimiento Criminal Federal. *(Federal Criminal Procedure*, William H. Whitman, ed. 1950, pág. 70 et seq.) En la interpretación de esta regla los tribunales federales han sostenido la misma doctrina en cuanto al defecto por duplicidad en una acusación. Véanse *United States* v. *Crummer*, 151 F.2d 958, *cert. denegado*, 327 U.S. 785; *Turner* v. *United States*, 16 F.2d 535; *Dell'Aira* v. *United States*, 10 F.2d 102; *Silkworth* v. *United States*, 10 F.2d 711, *cert. denegado*, 271 U.S. 664; *United States* v. *Kemler*, 44 F. Supp. 649; *United States* v. *B. Goedde & Co.*, 40 F. Supp. 523. La doctrina federal reconoce además que no adolece del defecto de duplicidad una acusación en la que se imputan varios actos relacionados, todos los cuales constituyen un solo delito aunque dichos actos pueden constituir en sí mismos delitos distintos. *United States* v. *Riedel*, 126 F.2d 81; *Blackmon* v. *United States*, 126 F.2d 214; *Rowan* v. *United States*, 281 Fed. 137, *cert. denegado* 260 U.S. 721; *Bridgeman* v. *United States*, 140 Fed. 577; *United States* v. *Atlantic Commission Co.*, 45 F. Supp. 187. Para otras excepciones a la pluralidad de delitos o duplicidad, véase "*Cyclopedia of Federal Procedure*", Vol. II, sec. 42.109, pág. 418.

error, de haberse cometido, fué subsanado en alguna forma durante el juicio, de suerte que se le preservara el derecho de todo acusado a un juicio justo e imparcial.

██ En vista de que la acusación no expresa el sitio, fecha y otras circunstancias de la transacción del soborno ofrecido y dado por Adorno a los cabos Padilla y Casalduc, podemos aceptar, sin resolverlo, que de su faz no se desprende la imputación de más de un delito al apelante. Sin embargo, a poco que se examine el pliego de particulares suministrado a los acusados por el fiscal, la prueba de cargo presentada durante el juicio y las instrucciones del juez se verá que al apelante Adorno se le acusó ante el Jurado de, (1) que un domingo del mes de abril de 1952, el acusado Adorno ofreció en Arecibo, por conducto de los detectives José M. Padilla y José Luciano Rivera, un soborno de $100 mensuales al cabo de la detective Francisco Casalduc para que dicho funcionario no le persiguiera por las infracciones a la ley en la operación de una banca de bolita en Arecibo y que a principios de mayo del mismo año le entregó a Casalduc por conducto de Padilla y Luciano la suma de $50 como parte de dicho soborno, y (2) que a fines de diciembre de 1952 y en Puerto Nuevo, Adorno dió a Padilla un soborno de $600 para que éste, como jefe del Escuadrón contra el Vicio, no persiguiera las infracciones a la Ley de Bolita cometidas por Adorno o sus agentes en la zona metropolitana.

El fiscal acusador sostuvo que en la acusación se le imputaba un solo delito de soborno al apelante Adorno. El juez sentenciador compartió ese criterio y después de expresar que el delito de soborno goza de la naturaleza del delito de fraude al erario público, en los que se pueden acumular varias apropiaciones para incluirlas como un solo delito, dijo el Juez: "Por analogía, en un caso de soborno, si se le imputa a una persona que ofreció y dió distintas cantidades en distintas oportunidades, no hay duda que puede ser acusado separadamente como delitos separados, por todas y cada una de las

veces que ofreció y dió dinero; pero si el Ministerio Fiscal escogió imputar una sola transacción, imputa una sola acusación, eso beneficia al acusado y no lo perjudica." [5]

Desde luego, es obvio que si una persona comete varios delitos de soborno, o de cualquier otra naturaleza, y es acusada de uno solo de ellos, resulta beneficiada porque de ser convicta estaría sujeta a una sola pena; pero no es de eso de lo que se queja el apelante en este caso. El problema envuelto es uno de carácter procesal que según sostiene el apelante, ha podido privarle de su derecho a un juicio justo. Se queja de que el procedimiento seguido en su contra le colocó en una situación embarazosa ante el jurado porque éste tuvo ante sí prueba de dos transacciones distintas, que constituían cada una de ellas, un delito separado de soborno, y que aun cuando nueve de los miembros del jurado no se pusieran de acuerdo en cuanto a la culpabilidad del apelante en una u otra transacción, podían sin embargo rendir un veredicto de culpabilidad, si un número de ellos, digamos únicamente cinco, entendían que el acusado había cometido soborno en Puerto Nuevo al ofrecer y dar $600 al cabo Padilla y otro número

---

[5] En varias ocasiones hemos dicho que el delito de abuso de confianza se comete después de estar los bienes legalmente en la posesión del acusado, o sea, en el momento de la malversación fraudulenta. *Pueblo* v. *Ríos,* 69 D.P.R. 830; *Pueblo* v. *Díaz,* 23 D.P.R. 257. Cuando el delito se comete por personas expertas en contabilidad se hace muy difícil la fijación de la fecha exacta de cada malversación y por eso se ha permitido que se acuse por una serie de apropiaciones como si todas constituyeran un solo delito. *Pueblo* v. *Pérez,* 47 D.P.R. 765, 783. También hemos seguido la doctrina adoptada por la mayoría de las cortes americanas, al efecto de que la malversación de fondos en pequeñas cantidades pertenecientes a una sola persona, a través de un período de tiempo, si responde a un solo plan o designio constituye un solo delito. La doctrina es la misma cuando los bienes pertenecen a distintas personas pero son apropiados fraudulentamente al mismo tiempo y en el mismo sitio. Un examen de los casos americanos revela que la adopción de estas doctrinas responden a una regla de necesidad, o sea, a la casi imposibilidad de probar la fecha exacta, sitio y cantidad apropiada fraudulentamente de bienes que están legalmente en posesión del acusado. *Pueblo* v. *Rosario,* 80 D.P.R. 624. No es pues tan clara la analogía entre el delito de abuso de confianza y el de soborno.

igual entendía que el acusado había sobornado al cabo Casalduc en Arecibo en la forma que relata la prueba aunque no creyeran que era culpable del soborno cometido en Puerto Nuevo.

■ Criterios generales para determinar si uno o más delitos están envueltos o han sido imputados incluyen (1) si los delitos en cuestión están constituídos por elementos diferentes; (2) si los delitos requieren diferente prueba y (3) si las palabras usadas en la acusación indican al sentido común la imputación de un solo delito. (⁶) Debemos determinar, por tanto, si en el presente proceso contra Adorno, había dos delitos envueltos.

Debe recordarse que si bien es cierto que la acusación imputa a los tres acusados, Casalduc, Padilla y Adorno, que de común acuerdo entre sí y con un propósito común cometieron soborno, el delito imputado no es el delito substantivo de conspiración y sí el de soborno. *People* v. *Eagan*, supra.

A nuestro juicio la prueba tendió a demostrar que el apelante Adorno cometió dos delitos similares. Uno de ellos consistió en ofrecer y dar $600 al cabo Padilla en diciembre de 1952 en Puerto Nuevo para que este funcionario no persiguiera las infracciones a la Ley de Bolita que dicho apelante o sus agentes cometieran en el área metropolitana. En esta transacción concurren todos los elementos del delito de soborno definido en el art. 82 del Código Penal. (⁷) Lo mismo podemos decir de la otra transacción realizada en Arecibo. Adorno cometió el delito de soborno al ofrecerle al cabo Casalduc, por mediación de sus agentes Padilla y Luciano, la

---

(⁶) II Nichols, *Cyclopedia of Federal Procedure*, sec. 42.107, pág. 417.

(⁷) Convenimos con el Fiscal de este Tribunal en que el delito de soborno establecido en el artículo 82 del Código Penal se compone de los siguientes tres elementos:

(1) Dar u ofrecer cualquier dádiva;

(2) Que la dación u ofrecimiento se haga a un funcionario ejecutivo de Puerto Rico, y

(3) Que la dación u ofrecimiento se haga con el propósito "de influir en cualquier acto, voto, dictamen u otro procedimiento de dicho funcionario en su carácter oficial".

suma de $100 mensuales y al darle en igual forma en mayo del mismo año, como parte de ese soborno la suma de $50 para que Casalduc no persiguiera a Adorno en la operación de su banca de bolita en Arecibo. Sin embargo, una y otra transacción requerían prueba diferente. La prueba aportada por el Estado para establecer la transacción de Puerto Nuevo con el cabo Padilla, no probaría la transacción en Arecibo con el cabo Casalduc. Esto resulta así porque si del testimonio del detective Luciano eliminamos todo lo declarado por él sobre los dos viajes que hizo a Arecibo en compañía del cabo Padilla y el ofrecimiento y la entrega de dinero que hizo al cabo Casalduc a nombre de Adorno, quedaría en el récord únicamente prueba del soborno de Adorno a Padilla en Puerto Nuevo, ya que aparte del testimonio del detective Luciano, la única otra prueba substancial en el récord sobre el soborno de Casalduc, son las admisiones hechas por el apelante Adorno al testigo de cargo Víctor Barrios Cano en el sentido de que él (Adorno) tenía controlado al Jefe del Escuadrón contra el Vicio de Arecibo para que no le persiguiera en su negocio de bolita. Es evidente pues, que sin la ayuda del testimonio de Luciano, la prueba de cargo hubiera sido insuficiente para probar el soborno de Casalduc por el acusado Adorno. Por lo tanto, las dos transacciones, la de Arecibo y la de Puerto Nuevo requerían prueba distinta. No podían establecerse las dos con la misma prueba. En su consecuencia, debemos llegar a la conclusión de que en el proceso contra Adorno estaban envueltos dos delitos separados de soborno.

Como ambos delitos son de igual o similar naturaleza y constituían parte de un plan común (sobornar a la policía tanto en San Juan como en Arecibo para que no persiguieran la banca de bolita de Adorno), el fiscal pudo imputarle al apelante ambos delitos en la misma acusación, cada uno de ellos en un cargo separado. [8] El fiscal, sin embargo,

---

[8] Véase el art. 77 del Código de Enjuiciamiento Criminal copiado en el escolio 2, ante.

optó por formular una acusación de un solo cargo contra los tres acusados. Las consecuencias perjudiciales al apelante de esta forma de enjuiciar, según él alega, pudieron evitarse, si el juez hubiera accedido a su petición para que ordenara al fiscal elegir la transacción o delito en que iba a fundar la acusación sin que ello impidiera al fiscal presentar prueba de la otra transacción bajo la conocida doctrina de que, como una excepción a la regla general, se permite la admisión de evidencia sobre otros delitos para demostrar intención, designio o un plan común—*Pueblo* v. *Archeval*, 74 D.P.R. 512—pero que en tal caso la deliberación del jurado se hubiera limitado a determinar si el acusado cometió o no el delito, que mediante la elección, el fiscal intentó probar aunque, desde luego, podía considerar, a los fines ya indicados, la evidencia sobre el otro delito. (9)

---

(9) No encontramos en nuestro Código de Enjuiciamiento Criminal disposición alguna sobre el derecho del acusado a solicitar, cuando median determinadas circunstancias, que el Estado elija el cargo o delito por el cual va a sostener la acusación. Sin embargo, este remedio de solicitar la elección surge de la necesidad de que se celebre un juicio justo, libre de desventajas y de situaciones embarazosas para el acusado. Algunos estatutos y reglas de procedimiento criminal en otras jurisdicciones hacen referencia a este remedio. Así por ejemplo, el estatuto penal de California (sec. 954) dispone que una acusación (*accusatory pleading*) puede imputar dos o más delitos diferentes relacionados en su comisión, o diferentes formas del mismo delito o dos o más delitos diferentes de la misma clase, bajo cargos separados y si dos o más acusaciones se radican en tales casos en la misma corte, ésta puede ordenar su consolidación. Dispone además dicha sección que el ministerio fiscal no puede ser requerido para que elija entre los diferentes delitos o cargo expuestos en la acusación pero que el acusado puede ser convicto de cualquier número de los delitos imputados, debiendo expresarse en el veredicto o en las conclusiones de la corte cada delito por el cual el acusado es convicto. Dicha sección además concede discreción a la corte para que en interés de la justicia y por causa justificada, ordene que los diferentes delitos o cargos imputados en la acusación sean juzgados separadamente o en grupos.

Cuando esta sec. 954 fué originalmente aprobada en 1872 prohibía la imputación de más de un delito en una acusación. En los años siguientes sufrió algunas enmiendas pero no fué hasta el 1905 que se autorizó la imputación de diferentes delitos en una acusación, bajo cargos separados, siempre que todos estuvieran relacionados con el mismo acto, transacción o evento y no hubieran ocurrido en épocas o lugares distintos. Se dispuso

El acusado apelante tendría razón a no ser porque todo el proceso fué conducido por el juez bajo la teoría de que al acusado se le estaba juzgando por un solo delito de soborno y que fué bajo esa teoría que sometió el caso al jurado. Así vemos que en relación con el apelante Adorno, el juez trasmitió al jurado la siguiente instrucción:

"Si ustedes encuentran probado, por el resultado de la prueba ofrecida por el Fiscal, fuera de toda duda razonable, que Feliciano Adorno, alias Chiquitín, en la fecha a que se refiere la acusación y el bill de particulares, que él es el acusado ofreció y dió dinero al co-acusado José M. Padilla, para que éste lo tomara para sí, y además le ofreció dinero para que se lo ofreciera a Casalduc, a cambio de que ni Casalduc en Arecibo ni Padilla en la zona metropolitana le persiguieran, o le denunciaran, o le afectaran el negocio de bolita, entonces si eso queda probado, es deber de ustedes traer un veredicto contra Feliciano Adorno de culpabilidad de soborno. Si esos hechos quedan pro-

también en virtud de esa enmienda que el ministerio fiscal no podía ser requerido para que eligiera entre los diferentes delitos o cargos expuestos en la acusación pero que el acusado solamente podía ser convicto de uno de los delitos imputados, el cual debía hacerse constar en el veredicto. Por una enmienda de 1915 se autorizó la imputación en una acusación de dos o más delitos diferentes conectados todos en su comisión, o diferentes formas del mismo delito, o dos o más delitos, o dos o más delitos diferentes de la misma clase, bajo cargos separados, y se dispuso que el acusado podía ser convicto de cualquier número de los delitos imputádosle, debiendo expresarse éstos en el veredicto. Finalmente esta sección fué enmendada en 1951, de suerte que dispone lo que expresamos al principio de este comentario. (Véase West's, *Annotated California Codes (Penal)*, sec. 954, pág. 299.)

En el caso de *People* v. *Hatch* (1910), 109 Pac. 1097, se acusó a Hatch de un delito de abuso de confianza. La prueba demostró que el acusado había cometido más de un delito de abuso de confianza. El fiscal no hizo la elección entre los distintos delitos ni el juez en sus instrucciones al jurado limitó al jurado a la consideración de uno solo de dichos delitos. El acusado fué convicto y en apelación se revocó la sentencia y se ordenó la celebración de un nuevo juicio. Dijo la corte, a la pág. 1102:

"Una vez probados varios delitos sustantivos, cada uno de los cuales apoyaría un veredicto de culpabilidad bajo la acusación imputando un delito, el fiscal debería elegir el delito en que se basará para condenar. *People* v. *Castro*, 133 Cal. 11, 65 Pac. 13; *People* v. *Williams*, 133 Cal. 165, 65 Pac. 323; *Edelhoff* v. *State*, 5 Wyo. 19, 36 Pac. 627; *Goodhue* v. *People*, 94 Ill. 37; *West* v. *People*, 137 Ill. 189, 27 N. E. 34, 34 N. E. 254; *State* v. *Crimmins*, 31 Kan. 376, 2 Pac. 574; *Mayo* v. *State*, 30 Ala. 32;

bados fuera de toda duda razonable, es deber de ustedes declarar en un caso al acusado José M. Padilla y en el otro caso a Feliciano Adorno culpable." (Quinta Pieza, págs. 1495 y 1496.)

De acuerdo con esta instrucción el jurado no podía rendir un veredicto de culpabilidad contra Adorno, si no encontraba probadas, fuera de duda razonable, las dos transacciones, o sea, la de Arecibo y la de Puerto Nuevo. En otras palabras, no bastaba según esta instrucción, que el jurado creyera que Adorno había sobornado a Casalduc o que había sobornado a Padilla o que algunos de los jurados creyeran que se había probado el soborno a Casalduc y otros creyeran que se había probado el soborno a Padilla, para que pudieran rendir un veredicto de culpabilidad. La razón es que la instrucción no fué dada en la disyuntiva pues como hemos visto, la instrucción requería para un veredicto de culpabilidad, que el jurado encontrara probados ambos sobornos, el de Casalduc y el de Padilla.

---

*Stockwell* v. *State,* 27 Ohio St. 563; *Bainbridge* v. *State,* 30 Ohio St. 264."
 Y luego a la página 1103 se expresó así:
 "Sin embargo la trayectoria seguida por el fiscal ha resultado ser un error perjudicial para el acusado en un derecho vital. La corte instruyó al jurado que 'si Uds. encuentran que el acusado fué el agente, abogado o fiduciario de Sarah E. Sage, y como tal agente, abogado o fiduciario recibió el dinero de ella según se imputa en la acusación, y en tres años antes del 23 de marzo de 1908 se los apropió fraudulentamente en una cantidad mayor de $50, no en la debida y legítima administración de su fideicomiso sino para su propio uso y beneficio, Uds. deben declarar al acusado culpable según se imputa en la acusación'. De haberse probado por la evidencia un solo delito de abuso de confianza esta instrucción hubiera estado correcta; o si la corte hubiera restringido al jurado en términos claros y explícitos a la consideración de sólo uno de los delitos probados. Pero en el caso de autos, bajo el único cargo consignado en la acusación se probaron varias malversaciones distintas y separadas, y no hubo elección en cuanto al delito sustantivo que podría servir de base para la acusación. Bajo esta instrucción, a tenor con la prueba en el récord, el jurado podía rendir un veredicto de culpabilidad según se imputaba, aunque cada miembro basó su veredicto en un delito distinto al que se consideró probado por cada uno de los otros miembros individualmente. A tenor con esta instrucción los varios miembros del jurado podían recorrer sobre la evidencia a su voluntad y escoger cualesquiera de los doce o más delitos probados y basar su veredicto sobre los mismos. Ninguna corte podría decir de este

542

Aun en los casos en que procede el remedio de la elección, el error cometido por la corte al negarlo, puede quedar subsanado, como ocurrió aquí, por una instrucción adecuada al jurado. Véase *People* v. *La Mantain*, 201 P.2d 598; *Bailey* v. *United States*, 278 Fed. 849; *Wiborg* v. *United States*, 41 L. ed. 289.

Bajo estas circunstancias no podemos convenir con el apelante en que la negativa del tribunal a ordenar al fiscal que hiciera la elección del cargo por el cual iba a sostener la acusación, le privó de un juicio justo e imparcial. El pliego de particulares le informó explícitamente los hechos y los cargos a los cuales tenía que enfrentarse en el juicio, se instruyó al jurado que debería encontrar probados esos hechos, fuera de duda razonable, para rendir un veredicto de culpabilidad, y aunque esos hechos establecieron la comisión de dos delitos de soborno, fué convicto y sentenciado de un solo delito. El

---

récord de cuál delito probado bajo esta acusación fué que el jurado declaró al acusado culpable."

En *People* v. *Simon*, (1913), 131 Pac. 102, citándose el caso de *Hatch* y otros, se dijo, a la pág. 103:

"Es indudable que si en un juicio donde la acusación imputa un solo delito, la evidencia presentada es suficiente para probar dos o más delitos separados y distintos, siendo cualquiera de ellos suficiente para sostener la imputación hecha en la acusación, debe requerirse, si se solicitare, una elección entre ellos. *People* v. *Castro*, 133 Cal. 11, 65 Pac. 13; *People* v. *Williams*, 133 Cal. 165, 65 Pac. 323; y *People* v. *Hatch*, 13 Cal. App. 521, 109 Pac. 1097."

El art. 77 de nuestro Código de Enjuiciamiento Criminal es sustancialmente igual a la Regla 8(a) de las de Procedimiento Criminal Federal. Dicha Regla 8(a) dispone:

"Regla 8. Acumulación de Delitos y de Acusados.

"(a) Acumulación de Delitos. Se podrán imputar dos o más delitos en la misma acusación, cada delito por separado, si los delitos imputados, ya sean delitos graves o menos graves, o ambos, son de naturaleza idéntica o similar o están basados en el mismo hecho o transacción o en dos o más hechos o transacciones relacionadas entre sí o como parte de un designio o plan común." (William M. Whitman, (ed. 1950), *Fed. Criminal Proc.*, pág. 68.) La referida regla permite la imputación de más de un delito en una acusación, bajo cargos separados, cuando (a) los delitos son de igual o similar naturaleza, o (b) han surgido del mismo acto o transacción, o (c) han surgido de dos o más actos o transacciones relacionadas entre sí o que constituyen parte de un plan común.

apelante, por tanto, lejos de recibir perjuicio, resultaba beneficiado con la imposición de una sola pena por los actos cometidos por él.

▉▉▉▉ Pasamos ahora a considerar los errores señalados bajo los números catorce y quince. El apelante Adorno solicitó del tribunal a quo que instruyera al jurado, como cuestión de derecho, que el testigo José Luciano Rivera era cómplice de dicho acusado Adorno y que por lo tanto su testimonio tenía que ser corroborado con otra prueba independiente que relacionara a Adorno con la comisión del delito imputádole en la acusación. Esta solicitud fué denegada y el tribunal, por el contrario, instruyó al jurado como cuestión de derecho que el testigo José Luciano Rivera no era cómplice del acusado Adorno. ([10])

Es doctrina sentada en esta jurisdicción, lo mismo que en California, que cuando un testigo comete el mismo delito imputado al acusado, tal testigo es un cómplice. *Pueblo* v.

---

En evitación de perjuicio tanto para el Estado como para el acusado, la Regla 14 de las de Procedimiento Criminal Federal da discreción a la corte, aun cuando la acusación cumpla con la Regla 8(a), para ordenar una elección o juicio separado para cada cargo, juicio separado para los acusados o cualquier otro remedio que la justicia requiera.

Aun antes de regir las Reglas de Procedimiento Criminal Federal, y sin que los estatutos hicieran mención de ellos, fué reconocida la discreción de los tribunales para conceder estos remedios. Whitman, *Federal Crim. Proc.*, sec. 14.3, pág. 114; Nichol's *Cyclopedia of Federal Procedure*, Vol. II, escolio 33 a la pág. 410; *Note of Advisory Committee on Rule 14*, y casos allí citados, 18 U.S.C. (ed. 1952) pág. 2533.

Si esto es así, mayor razón existe para que se conceda el remedio de elección cuando la acusación contiene un solo cargo y es luego que por las especificaciones hechas en un pliego de particulares o en la exposición de la teoría del fiscal al jurado, que se descubre que el fiscal intentaba probar, y a ese efecto presenta prueba, que el acusado había cometido dos delitos de igual o similar naturaleza o que forman parte de un plan común.

([10]) El Juez del tribunal a quo trasmitió al jurado la siguiente instrucción: "También en este caso, como han oído ustedes, se estuvo hablando y discutiendo sobre cómplice, que también se presentó la declaración de un cómplice. Yo les instruyo ahora a ustedes, de que José Luciano Rivera es cómplice de José M. Padilla, *pero que no es cómplice de Feliciano Adorno*. Solamente es cómplice de José M. Padilla y de Casalduc, pero ya Casalduc ustedes no tienen que tratar con él." (Bastardillas nuestras.)

*Rivera*, 79 D.P.R. 832; *Pueblo* v. *Villanueva*, 71 D.P.R. 917; *Pueblo* v. *Flecha*, 70 D.P.R. 685; *Pueblo* v. *Díaz*, 67 D.P.R. 785; *People* v. *Sagehorn*, 294 P.2d 1062.

Adorno fué acusado del delito de soborno definido en el art. 82 de nuestro Código Penal (véase escolio 7, antes) porque en el mes de abril de 1952 ofreció y dió dinero, por conducto del detective José Luciano Rivera al cabo Casalduc en Arecibo para que este funcionario no persiguiera las infracciones a la Ley de Bolita cometidas por él (Adorno) o sus agentes y además porque en diciembre del mismo año ofreció y dió dinero al cabo José M. Padilla en Puerto Nuevo, con el mismo propósito.

La prueba de cargo demostró que el detective Luciano, a nombre de Padilla y Adorno, ofreció y dió dinero al cabo Casalduc como soborno. Es insostenible la teoría del Estado al efecto de que en esa ocasión Luciano actuó como agente de Padilla y no de Adorno. Luciano sabía que era Adorno quien daba el soborno que él ofreció y dió a Casalduc. Al ofrecer y dar una dádiva a Casalduc para que este funcionario ejecutivo no persiguiera las infracciones a la Ley de la Bolita cometidas por Adorno o sus agentes en Arecibo, Luciano cometió el delito de soborno definido en el art. 82 del Código Penal. Y el delito así cometido por Luciano es el mismo delito por el cual se acusó a Adorno. Luciano y Adorno pudieron ser incluídos en la misma acusación por el delito de ofrecer y dar un soborno al cabo Casalduc. Siendo ello así, la conclusión inescapable es que Luciano es un cómplice de Adorno. *Pueblo* v. *Rivera*, supra; *Pueblo* v. *Villanueva*, supra; *Pueblo* v. *Flecha*, supra y *Pueblo* v. *Díaz*, supra. En su consecuencia, el tribunal a quo, debió instruir al jurado como cuestión de derecho que Luciano era un cómplice de Adorno y que su testimonio quedaba sujeto a la regla de corroboración. *Pueblo* v. *Flecha*, supra; *Pueblo* v. *Rivera*, supra. Al no hacerlo así, el Tribunal a quo cometió un error perjudicial al acusado .

■ En vista de ello, debemos determinar si en el récord hay prueba de corroboración del testimonio del detective Luciano. Si no la hay procedería la revocación de la sentencia apelada y la absolución del acusado. Si la hay, entonces procedería ordenar la celebración de un nuevo juicio.

El art. 253 del Código de Enjuiciamiento Criminal (34 L.P.R.A., sec. 732) dispone que no procede la convicción por declaración de un cómplice, a no ser que ésta sea confirmada[11] por alguna otra prueba que, por sí misma y sin la ayuda del testimonio del cómplice, tienda a demostrar la relación del acusado con la comisión del delito; no siendo suficiente dicha corroboración si sólo prueba la perpetración del delito o las circunstancias del mismo.

Para determinar si la declaración de un cómplice ha sido corroborada, este Tribunal ha adoptado la siguiente forma como una prueba adecuada: "eliminad del caso la evidencia del cómplice y entonces examinad la evidencia del otro testigo o testigos, con el objeto de determinar si hay prueba inculpatoria—prueba tendente a conectar al acusado con el delito. Si existe, el cómplice está corroborado; si no existe ninguna prueba inculpatoria, no hay corroboración, aunque el cómplice pueda ser corroborado en cuanto a cualquier número de hechos por él jurados." *Pueblo* v. *López*, 34 D.P.R. 260; *Pueblo* v. *Figueroa*, 46 D.P.R. 134. Antes de proceder a la aplicación de la anterior norma a los hechos de este caso, conviene recordar aquí que el testimonio de Luciano establece todos los elementos del delito de soborno imputado al apelante Adorno e incluso le conecta con la comisión de dicho delito. El ofrecimiento hecho por Luciano a Casalduc para que este funcionario viniera a casa de Padilla todos los meses a buscar la suma de $100 que le daba Adorno y la entrega por Luciano a Casalduc de los $50 que le mandaba Adorno, todo ello para que Casalduc no persiguiera las infracciones a la Ley de la Bolita cometidas por Adorno o sus agentes en

---

(11) El texto inglés dice *"corroborated"*.

el distrito de Arecibo, establece, sin lugar a dudas el *corpus delicti*. Se ha resuelto bajo estatutos como el nuestro que requieren prueba de corroboración de la declaración de un cómplice, que el testimonio de éste por sí solo, es suficiente para probar la comisión de un delito, o sea, el *corpus delicti*. *People* v. *Barclay*, 40 Cal.2d 146, 252 P.2d 321; *People* v. *Wayne*, 264 P.2d 547; *People* v. *Briley*, 9 Cal. App. 2d 84, 48 P.2d 734; *People* v. *Claasen*, 313 P.2d 579; *Madden* v. *State* (Okla.), 223 Pac. 716; *State* v. *Huntington* (Iowa), 80 N.W. 2d 744.

Reiteradamente este Tribunal ha resuelto que no se requiere prueba de corroboración para todos los elementos de un delito y asimismo, que no es necesario que la prueba de corroboración sea directa, ni muy fuerte, siempre que sea suficiente para relacionar al acusado con la comisión del delito. *Pueblo* v. *Portalatín*, 72 D.P.R. 152; *Pueblo* v. *Baerga*, 70 D.P.R. 90; *Pueblo* v. *Rosario*, 68 D.P.R. 566; *Pueblo* v. *Márquez*, 64 D.P.R. 371; *Pueblo* v. *Sierra*, 42 D.P.R. 504; *Pueblo* v. *Vázquez*, 40 D.P.R. 258; *Pueblo* v. *Maldonado*, 17 D.P.R. 23. Véanse además, *People* v. *Lyons*, 324 P.2d 556; *People* v. *Roach*, 306 P.2d 523; *People* v. *Comstock*, 305 P.2d 228; *People* v. *Blau*, 294 P.2d 1047, *cert. denegado* 352 U.S. 837.

En el récord de este caso hay prueba, independiente del testimonio de Luciano, suficiente para relacionar al acusado con la comisión del delito imputádole. Esa prueba demuestra que para la fecha indicada en la acusación Casalduc era el jefe del Escuadrón contra el Vicio en la Zona de Arecibo; que Casalduc vivía en las afueras de la ciudad de Arecibo; que para la fecha en que Luciano le entregó el soborno Casalduc estaba recluído en una clínica de aquella ciudad; que el acusado Adorno admitió a su antiguo socio en el juego de barajas Víctor Barrios Cano que a él (Adorno) no se le perseguía porque tenía conexiones con la detective; que pagaba un promedio de $2,000 a la policía y a la detective; que tenía con-

trolada la detective desde Cataño hasta Arecibo; que a Padilla le daba $500 y que tenía controlado al Jefe del Escuadrón contra el Vicio de Arecibo. (¹²)

La declaración de Víctor Barrios Cano en relación con las admisiones hechas por el acusado constituían de por sí suficiente corroboración. *Pueblo* v. *Segarra,* 70 D.P.R. 484; *Pueblo* v. *Baerga,* supra; *Pueblo* v. *Rosario,* supra; *Pueblo* v. *Márquez,* supra; *People* v. *Bonilla,* 124 Cal. App. 212, 12 P.2d 64; *People* v. *Rissman,* 316 P.2d 60; I Underhill, *Criminal Evidence* (5ª ed.), sec. 183, pág. 386.

Habiendo suficiente evidencia para ser sometida y considerada por el jurado, procede la celebración de un nuevo juicio.

 Se señala como cuarto error la admisión en evidencia, contra la objeción del apelante, de las manifestaciones hechas por Casalduc a Luciano cuando éste le ofreció el soborno. Esas manifestaciones fueron al efecto de que él (Casalduc) "tenía que pensarlo porque el Fiscal tenía interés

---

(¹²) Del testimonio de Víctor Barrios Cano transcribimos la parte aquí pertinente:

"P. Le pregunto si usted conversó con Feliciano Adorno, este acusado, conocido por Chiquitín, en el año 1952.

"R. Sí señor.

"P. ¿Para cuándo?

"R. Entre los meses de octubre a diciembre del año 1952.

"P. ¿Con relación a qué habló usted con él?

"R. En distintas ocasiones él habló conmigo refiriéndose a los negocios de bolita y las conexiones que él tenía con la detective, y por qué a él no se perseguía.

"P. Tenga la bondad de decir qué le dijo específicamente Feliciano Adorno.

"R. En una ocasión...

" . . . . . . . .

"P. Tenga la bondad de decir qué le dijo específicamente este acusado, Feliciano Adorno, conocido por Chiquitín, a usted.

"R. En una ocasión me encontró por aquí por San Juan como a eso de las cuatro de la tarde, y paró el automóvil y me dijo que me andaba buscando. Entonces me invitó a montar en el automóvil. Yo le acompañé. Al salir por ahí por el puente me dijo, 'Mira, Vitín, yo quiero que tú me consigas quién es el Rubio.' 'Yo le dije ¿el Rubio?' 'Sí, uno que se está dedicando a tirar bolita de Cataño a Bayamón, porque ese hombre me está

en perseguir a Chiquitín". El tribunal admitió esa prueba a base de que eran manifestaciones de un coacusado y no a base de que eran manifestaciones de un co-conspirador. La prueba tenía relevancia en cuanto a Casalduc pues evidenciaba la primera reacción de éste ante la oferta de soborno, que no fué ciertamente la de rechazar el soborno sino la de pensar si lo aceptaba o no. Otra prueba demostró que Casalduc, después de pensarlo según había quedado con Luciano, optó por aceptar el soborno. Claro está el tribunal debió instruir al jurado que dicha evidencia era prueba contra Casalduc y no contra Adorno.

 Los errores octavo y noveno no fueron cometidos. El testigo de cargo José Luciano declaró que al ser sorprendido por cuatro oficiales de la Policía en la noche del 13 de enero de 1953 en frente de la escuela Brumbaugh mientras

---

haciendo daño. Yo le voy a dar 24 horas para eliminarlo, porque para eso yo pago un promedio de $2,000 a la policía y la detective. Yo tengo controlada la detective desde Cataño hasta Arecibo, porque el negocio mío es un negocio grande, y cualquier persona que me interrumpa en mi negocio, yo lo elimino.'

"P. ¿Le dijo a quién específicamente tenía controlado?

"R. Sí señor.

"Sr. Andréu: Sugestiva.

"La Corte: Es sugestiva.

"P. Yo le pregunto si él mencionó nombres.

"R. Sí señor.

"Sr. Andréu: Objeción.

"La Corte: Se permite la pregunta.

"P. ¿A quién le dijo?

"R. A Padilla.

"P. ¿A cuál Padilla?

"R. Aquél que está ahí.

"P. ¿Qué le dijo de Padilla?

"R. Que él le daba a Padilla $500 mensuales.

"P. ¿Y le mencionó qué más?

"R. Y me dijo que tenía controlado el jefe de la detective del Escuadrón contra el Vicio de Arecibo.

"P. ¿Controlado para qué?

"R. Para que no le persiguiera en su negocio de bolita.

"P. Usted se está refiriendo a conversaciones que dice haber ocurrido entre octubre a diciembre de 1952.

"R. Sí señor."

(Tercera Pieza, págs. 417 a 419.)

tomaba $125 que en concepto de soborno le enviaba Cáceres al coacusado Padilla fué arrestado, conducido al Cuartel General y desarmado. Contrainterrogado por el abogado del apelante declaró que el día siguiente fué llevado a presencia del Coronel Roig y habló a solas con este oficial y que luego de esa entrevista declaró lo que sabía sobre el delito imputado a los acusados. Al preguntarle la defensa "¿Usted nos podría decir lo que usted y el Coronel Roig hablaron allí aquel día, al otro día?", la corte sostuvo una objeción del fiscal y la defensa anotó una excepción.

No cuestionamos la regla casi universal de que la promesa de inmunidad o de lenidad hecha por el Estado a un testigo para que declare en el juicio contra sus cómplices no lo descualifica como testigo ni afecta su competencia pero sí afecta la credibilidad del testigo y el peso que el jurado pueda darle a su testimonio. Por eso, prueba de que el testigo declara bajo promesa de inmunidad o de lenidad es pertinente a los fines ya indicados y el jurado debe considerarla. *People* v. *Gordon*, 163 P.2d 110; *State* v. *Woods*, 142 S. W.2d 87; *State* v. *White*, 126 S.W2d 234; *Vires* v. *Commonwealth*, 230 S.W.2d 455. Sin embargo, no erró el juez sentenciador al sostener la objeción del fiscal a una pregunta de la defensa para que el testigo Luciano relatara la conversación que sostuvo con el Coronel Roig. Inmediatamente después de ese incidente la defensa le preguntó a Luciano si allí no le habían ofrecido que no iba a ser procesado a lo que el testigo contestó en la negativa. Ya antes y a preguntas del abogado Sr. Andréu Ribas el testigo Luciano había contestado que nadie le había hecho promesa de que no sería procesado y específicamente que el Fiscal Viera no le hizo promesa alguna de no procesarlo si servía de testigo. Esa era la prueba pertinente que el jurado debía considerar pero como el testigo negó que se le hubiera hecho promesa alguna incumbía a la defensa demostrar, si contaba con prueba para ello, que el testigo mentía en ese extremo y que en realidad se le había

hecho tal promesa. Lejos de seguir ese camino la defensa se limitó a demostrar con el propio testigo Luciano que a pesar de éste haber admitido que sabía que cometía un delito de soborno cuando hizo la oferta y la entrega de dinero a Casalduc, no había sido procesado ni se le habían formulado cargos administrativos ni se le había separado del servicio. De estos hechos el jurado podía razonablemente inferir que a dicho testigo se le ofreció inmunidad y pudo considerar ese hecho al pesar su testimonio para darle la credibilidad que mereciera en caso de que el jurado no creyera la explicación que dió Luciano de que declaró al día siguiente y no la noche en que fué sorprendido recibiendo el soborno porque esa noche se encontraba muy nervioso.

También se queja el apelante de que se coartó su derecho a la repregunta del testigo Luciano al no permitirse que éste dijera lo hablado en la conferencia que tuvo con el Capitán Camacho al día siguiente de haber sido sorprendido aceptando el soborno de Cáceres. La queja del apelante resulta infundada por las razones ya expuestas al considerar el incidente relacionado con la conversación que tuvo el testigo con el Coronel Roig y además porque el apelante no preguntó al testigo sobre lo que éste había hablado con el Capitán Camacho. Fué a una pregunta específica del Lcdo. Andréu Ribas sobre lo que Camacho y el testigo hablaron, que éste respondió: "Yo le dije .... él trató de interrogarme, yo le dije que yo le diría al otro día. Que yo le dije a él que yo venía al otro día, que no iba a declarar nada."

█ Por el décimo señalamiento se sostiene que la Corte a quo cometió error al permitir al testigo Víctor Barrios Cano declarar que allá por el año 38 ó 39 jugaba dados, póker y monte con el acusado Adorno. Argumenta el apelante que dicha prueba era impertinente, irrelevante y remota; que dicha prueba fué presentada obedeciendo al plan general que tenía el Fiscal de tratar de obtener una convicción contra

Adorno por el hecho de que éste era un jugador de oficio que se había colocado fuera de la ley.

No tiene razón. Después de haber declarado el testigo Barrios Cano que en una ocasión Adorno le pidió que le investigara quién era el Rubio, una persona que le estaba haciendo daño en su negocio porque explotaba una banca de bolita en Cataño y Bayamón y a quien Adorno quería eliminar como bolitero, y así mismo después de declarar Barrios Cano sobre las admisiones que le hizo Adorno sobre el soborno a la policía, el fiscal le preguntó "¿Usted había tenido alguna relación con Feliciano Adorno, conocido por Chiquitín, en alguna ocasión anterior?" En contestación a ésta y otras preguntas el testigo relató sus relaciones con Adorno allá para los años 1938 ó 1939. Esa evidencia tendió a demostrar que el testigo Barrios Cano y el acusado Adorno fueron unos quince años atrás amigos y socios en los juegos ilegales de barajas y dados. Esos hechos pueden constituir la explicación de por qué Adorno hizo precisamente a Barrios Cano y no a otra persona la encomienda de investigar quién era "El Rubio" y además porque le hizo las admisiones, altamente incriminatorias sobre el soborno a la policía. La pertinencia pues, de las relaciones entre dicho testigo y el acusado salta a la vista. Era un factor que ayudaba al jurado a determinar la credibilidad que le mereciera el testigo. El error no fué cometido.

 El duodécimo error lo motiva la admisión del testimonio de Perfecto Segarra al efecto de que éste trabajó durante dos meses en el año 1946 con el acusado Adorno en una banca de bolita.

El error fué cometido. La prueba es remota. Si bien el mero transcurso del tiempo no es por sí solo factor determinante de la inadmisibilidad de la evidencia, ésta debe ser relevante y pertinente al delito perseguido. Carece de pertinencia la prueba de que el acusado explotaba una banca de bolita en el año 1946 si no median otras circunstancias o fac-

tores que conecten o relacionen ese hecho con el delito de so-
borno, alegadamente cometido por dicho acusado en 1952. (¹⁸)
Véase 22 C.J.S., sec. 638, pág. 977.

▆▆ Por el décimosexto señalamiento se imputa al tri-
bunal sentenciador error "al declarar sin lugar la moción del
acusado Feliciano Adorno de que se dejase sin efecto el ve-
redicto de culpabilidad rendido contra Feliciano Adorno, por
el fundamento de que dicho veredicto era en absoluto incon-
sistente con el veredicto absolutorio rendido por el mismo
jurado y con la misma evidencia a favor del acusado José M.
Padilla".

Este señalamiento descansa en premisas erróneas. En
primer lugar el delito imputado al acusado apelante es dis-
tinto al delito imputado a Padilla. Si bien en la acusación
se alegó que ambos acusados actuaron de común acuerdo, se
les persiguió por el delito sustantivo de soborno y no por el de
conspiración. En segundo lugar, la evidencia presentada con-
tra Adorno no era la misma presentada contra el coacusado
Padilla. Basta recordar que las admisiones hechas por
Adorno al testigo Barrios Cano hacían prueba altamente in-
criminatoria contra Adorno y no contra Padilla ya que dicha
prueba no era admisible contra éste en vista especialmente
de la ausencia de prueba de una conspiración entre Adorno
y Padilla aunque desde luego no hay duda de que parte de la
otra evidencia introducida envolvía a ambos en la comisión
de delitos.

El art. 92 del Código de Enjuiciamiento Criminal—34
L.P.R.A., sec. 147—equivalente sustancialmente al 920 del de
California dispone: "Como resultado de una acusación con-
tra varias personas, puede ser condenada o absuelta una o
varias de ellas."

Cuando existe una pequeña diferencia en la evidencia en
cuanto a dos personas acusadas y juzgadas conjuntamente, el

_____

(¹³) Aunque nos inclinamos a creer que este error por sí solo no daría
lugar a la revocación de la sentencia, es innecesario resolverlo en vista de
que por otros motivos estamos ordenando la celebración de un nuevo juicio.

jurado puede pesar la evidencia y hacer una concesión por tal diferencia y cuando eso se hace y una de ellas es absuelta y la otra convicta, el hecho de que la evidencia incrimine en parte a la persona absuelta, no requiere la absolución de la otra. Esta es la doctrina seguida en California y en otras jurisdicciones. *People* v. *Schwarz*, 248 Pac. 990; *People* v. *Taylor*, 199 P.2d 751; *People* v. *Wilson*, 129 P.2d 54; *People* v. *Shaw*, 252 P.2d 670; *People* v. *Edwards*, 185 P.2d 74; *People* v. *Hamilton*, 274 P.2d 175; *Bucklin* v. *United States*, 40 L. ed. 305; *United States* v. *Hare*, 153 F.2d 816; *Bartlett* v. *United States*, 166 F.2d 920; *Cf. Davis* v. *State*, 23 So. 770; *People* v. *Talbot*, 22 P.2d 587, 28 P.2d 1057; *State* v. *Ward*, 228 Pac. 180; V Wharton's *Criminal Law & Procedure* (ed. 1957), sec. 2128, pág. 320.

En el caso de *Edwards*, supra, marido y mujer fueron acusados de escalamiento. La acusación contenía cinco cargos. Un policía declaró que el marido había confesado en cuanto a uno de los cargos. Se resolvió que los veredictos absolviendo a la mujer y condenando al marido no eran inconsistentes. El criterio que se ha seguido en algunas de las decisiones arriba citadas es de si realmente hay evidencia para sostener el veredicto condenatorio. En este caso ya hemos dicho que el fiscal presentó evidencia, que de ser creída por el juzgador de los hechos, es suficiente para condenar al acusado.

Al resolver que este error no fué cometido nos estamos limitando a los hechos del caso y por lo tanto, no adelantamos criterio en cuanto a otras situaciones, como por ejemplo, cuando la evidencia presentada contra dos coacusados es idéntica, y aunque suficiente para condenarlos a ambos, el jurado absuelve a uno y condena al otro.

Toda vez que estamos ordenando la celebración de un nuevo juicio, por razones obvias, es innecesario discutir los errores primero, quinto, sexto y séptimo.

En virtud de lo anteriormente expuesto, *la sentencia dictada contra el acusado apelante será revocada y se ordenará la celebración de un nuevo juicio.*

El Juez Presidente Sr. Negrón Fernández no intervino.